## REYNOLDS *v.* UNITED STATES.

1. Sect. 808 of the Revised Statutes, providing for impanelling grand juries and prescribing the number of which they shall consist, applies only to the Circuit and the District Courts of the United States. An indictment for bigamy under sect. 5352 may, therefore, be found in a district court of Utah, by a grand jury of fifteen persons, impanelled pursuant to the laws of that Territory.

2 A petit juror in a criminal case testified on his *voire dire* that he believed tha; he had formed an opinion, although not upon evidence produced in court, as to the guilt or innocence of the prisoner; but that he had not expressed it, and did not think that it would influence his verdict. He was thereupon challenged by the prisoner for cause. The court overruled the challenge. *Held*, that its action was not erroneous.

3. Where it is apparent from the record that the challenge of a petit juror, it it had been made by the United States for favor, should have been sustained, the judgment against the prisoner will not be reversed, simply because the challenge was in form for cause.

4. Although the Constitution declares that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him, yet if they are absent by his procurement, or when enough has been proved to cast upon him the burden of showing, and he, having full opportunity therefor, fails to show, that he has not been instrumental in concealing them or in keeping them away, he is in no condition to assert that his constitutional right has been violated by allowing competent evidence of the testimony which they gave on a previous trial between the United States and him upon the same issue. Such evidence is admissible.

5. Said sect. 5352 is in all respects constitutional and valid.

6. The scope and meaning of the first article of the amendments to the Constitution discussed.

7. A party's religious belief cannot be accepted as a justification for his committing an overt act, made criminal by the law of the land. Where, therefore, the prisoner, knowing that his wife was living, married again in Utah, and, when indicted and tried therefor, set up that the church whereto he belonged enjoined upon its male members to practise polygamy, and that he, with the sanction of the recognized authorities of the church, and by a ceremony performed pursuant to its doctrines, did marry again, — *Held*, that the court properly refused to charge the jury that he was entitled to an acquittal, although they should find that he had contracted such second marriage pursuant to, and in conformity with, what he believed at the time to be a religious duty.

8. The court told the jury to "consider what are to be the consequences to the innocent victims of this delusion [the doctrine of polygamy]. As this contest goes on they multiply, and there are pure-minded women and there are innocent children, — innocent in a sense even beyond the degree of the innocence of childhood itself. These are to be the sufferers; and as jurors fail to do their duty, and as these cases come up in the Territory of Utah, just so do these victims multiply and spread themselves over the land." *Held*, that the charge was not improper.

ERROR to the Supreme Court of the Territory of Utah.

This is an indictment found in the District Court for the third judicial district of the Territory of Utah, charging George Reynolds with bigamy, in violation of sect. 5352 of the Revised Statutes, which, omitting its exceptions, is as follows: —

" Every. person having a husband, or wife living, who marries another, whether married or single, in a Territory, or other place over which the United States have exclusive jurisdiction, is guilty of bigamy, and shall be punished by a fine of not more than $500, and by imprisonment for a term of not more than five years."

The prisoner pleaded in abatement that the indictment was not found by a legal grand jury, because fifteen persons, and no more, were impanelled and sworn to serve as a grand jury at the term of the court during which the indictment was found, whereas sect. 808 of the Revised Statutes of the United States enacts that every grand jury impanelled before any District or Circuit Court shall consist of not less than sixteen persons.

An act of the legislature of Utah of Feb. 18, 1870, provides that the court shall impanel fifteen men to serve as a grand jury. Compiled Laws of Utah, ed. of 1876, p. 357, sect. 4.

The court overruled the plea, on the ground that the territorial enactment governed.

The prisoner then pleaded not guilty. Several jurors were examined on their *voire dire* by the district attorney. Among them was Eli Ransohoff, who, in answer to the question, " Have you formed or expressed an opinion as to the guilt or innocence of the prisoner at the bar?" said, " I have expressed an opinion by reading the papers with the reports of the trial."

*Q.* " Would that opinion influence your verdict in hearing the evidence?"

*A.* " I don't think it would."

By the defendant: " You stated that you had formed some opinion by reading the reports of the previous trial?"

*A.* " Yes."

*Q.* " Is that an impression which still remains upon your mind?"

*A.* "No; I don't think it does: I only glanced over it, as everybody else does."

*Q.* "Do you think you could try the case wholly uninfluenced by any thing?"

*A.* "Yes."

Charles Read, called as a juror, was asked by the district attorney, "Have you formed or expressed any opinion as to the guilt or innocence of this charge?"

*A.* "I believe I have formed an opinion."

By the court: "Have you formed and expressed an opinion?"

*A.* "No, sir; I believe not."

*Q.* "You say you have formed an opinion?"

*A.* "I have."

*Q.* "Is that based upon evidence?"

*A.* "Nothing produced in court."

*Q.* "Would that opinion influence your verdict?"

*A.* "I don't think it would."

By defendant: "I understood you to say that you had formed an opinion, but not expressed it."

*A.* "I don't know that I have expressed an opinion: I have formed one."

*Q.* "Do you now entertain that opinion?"

*A.* "I do."

The defendant challenged each of these jurors for cause. The court overruled the challenge, and permitted them to be sworn. The defendant excepted.

The court also, when Homer Brown was called as a juror, allowed the district attorney to ask him the following questions: *Q.* "Are you living in polygamy?" *A.* "I would rather not answer that." The court instructed the witness that he must answer the question, unless it would criminate him. By the district attorney: "You understand the conditions upon which you refuse?" *A.* "Yes, sir." — *Q.* "Have you such an opinion that you could not find a verdict for the commission of that crime?" *A.* "I have no opinion on it in this particular case. I think under the evidence and the law I could render a verdict accordingly." Whereupon the United States challenged the said Brown for favor, which challenge was sustained by the court, and the defendant excepted.

John W. Snell, also a juror, was asked by the district attorney on *voire dire:*  *Q.* "Are you living in polygamy?" *A.* "I decline to answer that question." — *Q.* "On what ground?" *A.* "It might criminate myself; but I am only a fornicator." Whereupon Snell was challenged by the United States for cause, which challenge was sustained, and the defendant excepted.

After the trial commenced, the district attorney, after proving that the defendant had been married on a certain day to Mary Ann Tuddenham, offered to prove his subsequent marriage to one Amelia Jane Schofield during the lifetime of said Mary. He thereupon called one Pratt, the deputy marshal, and showed him a subpœna for witnesses in this case, and among other names thereon was the name of Mary Jane Schobold, but no such name as Amelia Jane Schofield. He testified that this subpœna was placed in his hands to be served.

*Q.* "Did you see Mr. Reynolds when you went to see Miss Schofield?"

*A.* "Yes, sir."

*Q.* "Who did you inquire for?"

*A.* "I inquired for Mary Jane Schofield, to the best of my knowledge. I will state this, that I inserted the name in the subpœna, and intended it for the name of the woman examined in this case at the former term of the court, and inquired for Mary Jane Schofield, or Mrs. Reynolds, I do not recollect certainly which."

*Q.* "State the reply."

*A.* "He said she was not at home."

*Q.* "Did he say any thing further."

*A.* "I asked him then where I could find her. I said, 'Where is she?' And he said, 'You will have to find out.'"

*Q.* "Did he know you to be a deputy marshal?"

*A.* "Yes, sir."

*Q.* "Did you tell him what your business was as deputy marshal?"

*A.* "I don't remember now: I don't think I did."

*Q.* "What else did he say?"

*A.* " He said, just as I was leaving, as I understood it, that she did not appear in this case."

The court then ordered a subpœna to issue for Amelia Jane Schofield, returnable instanter.

Upon the following day, at ten o'clock A.M., the said subpœna for the said witness having issued about nine o'clock P.M. of the day before, the said Arthur Pratt was again called upon, and testified as follows : —

*Q.* (By district attorney.)  " State whether you are the officer that had subpœna in your hands."  (Exhibiting subpœna last issued, as above set forth.)

*A.* " Yes, sir."

*Q.* " State to the court what efforts you have made to serve it."

*A.* " I went to the residence of Mr. Reynolds, and a lady was there, his first wife, and she told me that this woman was not there ; that that was the only home that she had, but that she hadn't been there for two or three weeks.  I went again this morning, and she was not there."

*Q.* " Do you know any thing about her home, — where she resides ? "

*A.* " I know where I found her before."

*Q.* " Where ? "

*A.* " At the same place."

*Q.* " You are the deputy marshal that executed the process of the court ? "

*A.* " Yes, sir."

*Q.* " Repeat what Mr. Reynolds said to you when you went with the former subpœna introduced last evening."

*A.* " I will state that I put her name on the subpœna myself.  I know the party, and am well acquainted with her, and I intended it for the same party that I subpœnaed before in this case.  He said that she was not in, and that I could get a search-warrant if I wanted to search the house.  I said, ' Will you tell me where she is ? '  He said, ' No ; that will be for you to find out.'  He said, just as I was leaving the house, — I don't remember exactly what it was, but my best recollection is that he said she would not appear in this case."

*Q.* " Can't you state that more particularly ? "

*A.* " I can't give you the exact words, but I can say that was the purport of them."

*Q.* " Give the words as nearly as you can."

*A.* " Just as I said, I think those were his words."

The district attorney then offered to prove what Amelia Jane Schofield had testified to on a trial of another indictment charging the prisoner with bigamy in marrying her ; to which the prisoner objected, on the ground that a sufficient foundation had not been laid for the introduction of the evidence.

A. S. Patterson, having been sworn, read, and other witnesses stated, said Amelia's testimony on the former trial, tending to show her marriage with the defendant. The defendant excepted to the admission of the evidence.

The court, in summing up to the jury, declined to instruct them, as requested by the prisoner, that if they found that he had married in pursuance of and conformity with what he believed at the time to be a religious duty, their verdict should be " not guilty," but instructed them that if he, under the influence of a religious belief that it was right, had " deliberately married a second time, having a first wife living, the want of consciousness of evil intent — the want of understanding on his part that he was committing crime — did not excuse him, but the law inexorably, in such cases, implies criminal intent."

The court also said : " I think it not improper, in the discharge of your duties in this case, that you should consider what are to be the consequences to the innocent victims of this delusion. As this contest goes on, they multiply, and there are pure-minded women and there are innocent children, — innocent in a sense even beyond the degree of the innocence of childhood itself. These are to be the sufferers ; and as jurors fail to do their duty, and as these cases come up in the Territory, just so do these victims multiply and spread themselves over the land."

To the refusal of the court to charge as requested, and to the charge as given, the prisoner excepted. The jury found him guilty, as charged in the indictment ; and the judgment that he be imprisoned at hard labor for a term of two years, and pay

a fine of $500, rendered by the District Court, having been affirmed by the Supreme Court of the Territory, he sued out this writ of error.

The assignments of error are set out in the opinion of the court.

*Mr. George W. Biddle* and *Mr. Ben Sheeks* for the plaintiff in error.

*First,* The jury was improperly drawn. Two of the jurors were challenged for cause by the defendant below, because they admitted that they had formed, and still entertained, an opinion upon the guilt or innocence of the prisoner. The holding by a juror of any opinions which would disqualify him from rendering a verdict in accordance with the law of the land, is a valid objection to his serving.

An opinion based merely upon a hypothetical case, as that "if so and so is true, the prisoner is guilty," is not always sufficient; but where the opinion is as to the *actual fact* of guilt or innocence, it is a disqualification, according to all the authorities. Burr's Trial, 414, 415; *United States* v. *Wilson,* 1 Baldw. 83; *Ex parte Vermilyea,* 6 Cow. (N. Y.) 563; *The People* v. *Mather,* 4 Wend. (N.Y.) 238; *Cancemi* v. *People,* 16 N.Y. 502; *Fouts* v. *The State,* 11 Ohio St. 472; *Neely* v. *The People,* 23 Ill. 685; *Schoeffler* v. *The State,* 3 Wis. 831; *Trimble* v. *The State,* 2 Greene (Iowa), 404; *Commonwealth* v. *Lesher,* 17 Serg. & R. (Pa.) 155; *Staup* v. *Commonwealth,* 74 Pa. St. 458; *Armistead's Case,* 11 Leigh (Va.), 658; *Stewart* v. *The State,* 13 Ark. 740.

It was clearly erroneous for the prosecution to ask several of the jurymen, upon *voire dire,* whether they were living in polygamy; questions which tend to disgrace the person questioned, or to render him amenable to a criminal prosecution, have never been allowed to be put to a juror. *Anonymous,* Salk. 153; Bacon, Abr., tit. Juries, 12 (f); 7 Dane, Abr. 334; *Hudson* v. *The State,* 1 Blackf. (Ind.) 319.

*Second,* The proof of what the witness, *Amelia Jane Schofield,* testified to in a former trial, under another indictment, should not have been admitted. The constitutional right of a prisoner to confront the witness and cross-examine him is not to be abrogated, unless it be shown that the witness is dead, or

out of the jurisdiction of the court; or that, *having been summoned*, he appears to have been kept away by the adverse party on the trial. It appeared not only that no such person as *Amelia Jane Schofield* had been subpœnaed, but that no subpœna had ever been taken out for her. An unserved subpœna with the name of *Mary* Jane *Schobold* was shown. At nine o'clock in the evening, during the trial, a new subpœna was issued; and on the following morning, with no attempt to serve it beyond going to the prisoner's usual residence and inquiring for her, the witness Patterson was allowed to read from a paper what purported to be statements made by *Amelia Jane Schofield* on a former trial. No proof was offered as to the genuineness of the paper or its origin, nor did the witness testify to its contents of his own knowledge. This is in the teeth of the ruling in *United States* v. *Wood* (3 Wash. 440), and the rule laid down in all the American authorities. *Richardson* v. *Stewart*, 2 Serg. & R. (Pa.) 84; *Chess* v. *Chess*, 17 id. 409; *Huidekopper* v. *Cotton*, 3 Watts (Pa.), 56; *Powell* v. *Waters*, 17 Johns. (N.Y.) 176; *Cary* v. *Sprague*, 12 Wend. (N.Y.) 45; *The People* v. *Newman*, 5 Hill (N.Y.), 295; *Brogy* v. *The Commonwealth*, 10 Gratt. (Va.) 722; *Bergen* v. *The People*, 17 Ill. 426; *Dupree* v. *The State*, 33 Ala. 380.

*Third*, As to the constitutionality of the Poland Bill. Rev. Stat., sect. 5352. Undoubtedly Congress, under art. 4, sect. 3, of the Constitution, which gives "power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States," and under the decisions of this court upon it, may legislate over such territory, and regulate the form of its local government. But its legislation can be neither exclusive nor arbitrary. The power of this government to obtain and hold territory over which it might legislate, without restriction, would be inconsistent with its own existence in its present form. There is always an excess of power exercised when the Federal government attempts to provide for more than the assertion and preservation of its rights over such territory, and interferes by positive enactment with the social and domestic life of its inhabitants and their internal police. The offence prohibited by sect. 5352 is not a *malum in se;* it is not prohibited by the decalogue; and, if it be said

that its prohibition is to be found in the teachings of the New Testament, we know that a majority of the people of this Territory deny that the Christian law contains any such prohibition.

*The Attorney-General* and *The Solicitor-General, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The assignments of error, when grouped, present the following questions : —

1. Was the indictment bad because found by a grand jury of less than sixteen persons ?

2. Were the challenges of certain petit jurors by the accused improperly overruled ?

3. Were the challenges of certain other jurors by the government improperly sustained ?

4. Was the testimony of Amelia Jane Schofield, given at a former trial for the same offence, but under another indictment, improperly admitted in evidence?

5. Should the accused have been acquitted if he married the second time, because he believed it to be his, religious duty?

6. Did the court err in that part of the charge which directed the attention of the jury to the consequences of polygamy?

These questions will be considered in their order.

1. As to the grand jury.

The indictment was found in the District Court of the third judicial district of the Territory. The act of Congress " in relation to courts and judicial officers in the Territory of Utah," approved June 23, 1874 (18 Stat. 253), while regulating the qualifications of jurors in the Territory, and prescribing the mode of preparing the lists from which grand and petit jurors are to be drawn, as well as the manner of drawing, makes no provision in respect to the number of persons of which a grand jury shall consist. Sect. 808, Revised Statutes, requires that a grand jury impanelled before any district or circuit court of the United States shall consist of not less than sixteen nor more than twenty-three persons, while a statute of the Territory limits the number in the district courts of the Territory

to fifteen. Comp. Laws Utah, 1876, 357. The grand jury which found this indictment consisted of only fifteen persons, and the question to be determined is, whether the section of the Revised Statutes referred to or the statute of the Territory governs the case.

By sect. 1910 of the Revised Statutes the district courts of the Territory have the same jurisdiction in all cases arising under the Constitution and laws of the United States as is vested in the circuit and district courts of the United States; but this does not make them circuit and district courts of the United States. We have often so decided. *American Insurance Co.* v. *Canter*, 1 Pet. 511; *Benner et al.* v. *Porter*, 9 How. 235; *Clinton* v. *Englebrecht*, 13 Wall. 434. They are courts of the Territories, invested for some purposes with the powers of the courts of the United States. Writs of error and appeals lie from them to the Supreme Court of the Territory, and from that court as a territorial court to this in some cases.

Sect. 808 was not designed to regulate the impanelling of grand juries in all courts where offenders against the laws of the United States could be tried, but only in the circuit and district courts. This leaves the territorial courts free to act in obedience to the requirements of the territorial laws in force for the time being. *Clinton* v. *Englebrecht, supra; Hornbuckle* v. *Toombs,* 18 Wall. 648. As Congress may at any time assume control of the matter, there is but little danger to be anticipated from improvident territorial legislation in this particular. We are therefore of the opinion that the court below no more erred in sustaining this indictment than it did at a former term, at the instance of this same plaintiff in error, in adjudging another bad which was found against him for the same offence by a grand jury composed of twenty-three persons. 1 Utah, 226.

2. As to the challenges by the accused.

By the Constitution of the United States (Amend. VI.), the accused was entitled to a trial by an impartial jury. A juror to be impartial must, to use the language of Lord Coke, " be indifferent as he stands unsworn." Co. Litt. 155 *b.* Lord Coke also says that a principal cause of challenge is " so called because, if it be found true, it standeth sufficient of itself, without

leaving any thing to the conscience or discretion of the triers" (id. 156 *b*) ; or, as stated in Bacon's Abridgment, " it is grounded on such a manifest presumption of partiality, that, if found to be true, it unquestionably sets aside the . . . juror." Bac. Abr., tit. Juries, E. 1. " If the truth of the matter alleged is admitted, the law pronounces the judgment; but if denied, it must be made out by proof to the satisfaction of the court or the triers." Id. E. 12. To make out the existence of the fact, the juror who is challenged may be examined on his *voire dire*, and asked any questions that do not tend to his infamy or disgrace.

All of the challenges by the accused were for principal cause. It is good ground for such a challenge that a juror has formed an opinion as to the issue to be tried. The courts are not agreed as to the knowledge upon which the opinion must rest in order to render the juror incompetent, or whether the opinion must be accompanied by malice or ill-will; but all unite in holding that it must be founded on some evidence, and be more than a mere impression. Some say it must be positive (Gabbet, Criminal Law, 391) ; others, that it must be decided and substantial (*Armistead's Case*, 11 Leigh (Va.), 659; *Wormley's Case*, 10 Gratt. (Va.) 658; *Neely* v. *The People*, 13 Ill. 685) ; others, fixed (*State* v. *Benton*, 2 Dev. & B. (N. C.) L. 196) ; and, still others, deliberate and settled (*Staup* v. *Commonwealth*, 74 Pa. St. 458; *Curley* v. *Commonwealth*, 84 id. 151). All concede, however, that, if hypothetical only, the partiality is not so manifest as to necessarily set the juror aside. Mr. Chief Justice Marshall, in *Burr's Trial* (1 Burr's Trial, 416), states the rule to be that " light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him." The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity,

brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality.  The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence.  The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest.  No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for new trial because the verdict is against the evidence.  It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial.  The case must be one in which it is manifest the law left nothing to the " conscience or discretion " of the court.

The challenge in this case most relied upon in the argument here is that of Charles Read.  He was sworn on his *voire dire ;* and his evidence,[1] taken as a whole, shows that he " believed " he had formed an opinion which he had never expressed, but which he did not think would influence his verdict on hearing the testimony.  We cannot think this is such a manifestation of partiality as to leave nothing to the " conscience or discretion " of the triers.  The reading of the evidence leaves the impression that the juror had some hypothetical opinion about the case, but it falls far short of raising a manifest presumption of partiality.  In considering such questions in a reviewing court, we ought not to be unmindful of the fact we have so often observed in our experience, that jurors not unfrequently seek to excuse themselves on the ground of having formed an opinion, when, on examination, it turns out that no real disqualification exists.  In such cases the manner of the

[1] *Supra,* p. 147.

juror while testifying is oftentimes more indicative of the real character of his opinion than his words.    That is seen below, but cannot always be spread upon the record.    Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.    The affirmative of the issue is upon the challenger.    Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside, and it will not be error in the court to refuse to do so.    Such a case, in our opinion, was not made out upon the challenge of Read.    The fact that he had not expressed his opinion is important only as tending to show that he had not formed one which disqualified him.    If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed. Under these circumstances, it is unnecessary to consider the case of Ransohoff, for it was confessedly not as strong as that of Read.

3. *As to the challenges by the government.*

The questions raised upon these assignments of error are not whether the district attorney should have been permitted to interrogate the jurors while under examination upon their *voire dire* as to the fact of their living in polygamy.    No objection was made below to the questions, but only to the ruling of the court upon the challenges after the testimony taken in answer to the questions was in.    From the testimony it is apparent that all the jurors to whom the challenges related were or had been living in polygamy.    It needs no argument to show that such a jury could not have gone into the box entirely free from bias and prejudice, and that if the challenge was not good for principal cause, it was for favor.    A judgment will not be reversed simply because a challenge good for favor was sustained in form for cause.    As the jurors were incompetent and properly excluded, it matters not here upon what form of challenge they were set aside.    In one case the challenge was for favor.    In the courts of the United States all challenges are tried by the court without the aid of triers (Rev. Stat. sect. 819), and we are not advised that the practice in the territorial courts of Utah is different.

4. As to the admission of evidence to prove what was sworn to by Amelia Jane Schofield on a former trial of the accused for the same offence but under a different indictment.

The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him ; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him ; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

In *Lord Morley's Case* (6 State Trials, 770), as long ago as the year 1666, it was resolved in the House of Lords " that in case oath should be made that any witness, who had been examined by the coroner and was then absent, was detained by the means or procurement of the prisoner, and the opinion of the judges asked whether such examination might be read, we should answer, that if their lordships were satisfied by the evidence they had heard that the witness was detained by means or procurement of the prisoner, then the examination might be read ; but whether he was detained by means or procurement of the prisoner was matter of fact, of which we were not the judges, but their lordships." This resolution was followed in *Harrison's Case* (12 id. 851), and seems to have been recognized as the law in England ever since. In *Regina* v. *Scaife* (17 Ad. & El. N. s. 242), all the judges agreed that if the prisoner had resorted to a contrivance to keep a witness out of the way, the deposition of the witness, taken before a magistrate and in the presence of the prisoner, might be read. Other cases to the same effect are to be found, and in this country the ruling has been in the same way. *Drayton* v. *Wells*, 1 Nott & M. (S. C.) 409 ; *Williams* v. *The State*, 19 Ga. 403. So that now, in the leading text-books, it is laid down that if a witness is kept away by the adverse party,

his testimony, taken on a former trial between the same parties upon the same issues, may be given in evidence. 1 Greenl. Evid., sect. 163; 1 Taylor, Evid., sect. 446.  Mr. Wharton (1 Whart. Evid., sect. 178) seemingly limits the rule somewhat, and confines it to cases where the witness has been corruptly kept away by the party against whom he is to be called, but in reality his statement is the same as that of the others; for in all it is implied that the witness must have been wrongfully kept away.  The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong; and, consequently, if there has not been, in legal contemplation, a wrong committed, the way has not been opened for the introduction of the testimony.  We are content with this long-established usage, which, so far as we have been able to discover, has rarely been departed from.  It is the outgrowth of a maxim based on the principles of common honesty, and, if properly administered, can harm no one.

Such being the rule, the question becomes practically one of fact, to be settled as a preliminary to the admission of secondary evidence.  In this respect it is like the preliminary question of the proof of loss of a written instrument, before secondary evidence of the contents of the instrument can be admitted.  In *Lord Morley's Case* (*supra*), it would seem to have been considered a question for the trial court alone, and not subject to review on error or appeal; but without deeming it necessary in this case to go so far as that, we have no hesitation in saying that the finding of the court below is, at least, to have the effect of a verdict of a jury upon a question of fact, and should not be disturbed unless the error is manifest.

The testimony shows that the absent witness was the alleged second wife of the accused; that she had testified on a former trial for the same offence under another indictment; that she had no home, except with the accused; that at some time before the trial a subpœna had been issued for her, but by mistake she was named as Mary Jane Schobold; that an officer who knew the witness personally went to the house of the accused to serve the subpœna, and on his arrival inquired for her, either by the name of Mary Jane Schofield or Mrs. Reynolds; that he was told by the accused she was not at home;

that he then said, " Will you tell me where she is ? " that the reply was " No ; that will be for you to find out; " that the officer then remarked she was making him considerable trouble, and that she would get into trouble herself; and the accused replied, " Oh, no ; she won't, till the subpœna is served upon her," and then, after some further conversation, that " She does not appear in this case."

It being discovered after the trial commenced that a wrong name had been inserted in the subpœna, a new subpœna was issued with the right name, at nine o'clock in the evening. With this the officer went again to the house, and there found a person known as the first wife of the accused. He was told by her that the witness was not there, and had not been for three weeks. He went again the next morning, and not finding her, or being able to ascertain where she was by inquiring in the neighborhood, made return of that fact to the court. At ten o'clock that morning the case was again called; and the foregoing facts being made to appear, the court ruled that evidence of what the witness had sworn to at the former trial was admissible.

In this we see no error. The accused was himself personally present in court when the showing was made, and had full opportunity to account for the absence of the witness, if he would, or to deny under oath that he had kept her away. Clearly, enough had been proven to cast the burden upon him of showing that he had not been instrumental in concealing or keeping the witness away. Having the means of making the necessary explanation, and having every inducement to do so if he would, the presumption is that he considered it better to rely upon the weakness of the case made against him than to attempt to develop the strength of his own. Upon the testimony as it stood, it is clear to our minds that the judgment should not be reversed because secondary evidence was admitted.

This brings us to the consideration of what the former testimony was, and the evidence by which it was proven to the jury.

It was testimony given on a former trial of the same person for the same offence, but under another indictment. It was

substantially testimony given at another time in the same cause. The accused was present at the time the testimony was given, and had full opportunity of cross-examination. This brings the case clearly within the well-established rules. The cases are fully cited in 1 Whart. Evid., sect. 177.

The objection to the reading by Mr. Patterson of what was sworn to on the former trial does not seem to have been because the paper from which he read was not a true record of the evidence as given, but because the foundation for admitting the secondary evidence had not been laid. This objection, as has already been seen, was not well taken.

5. As to the defence of religious belief or duty.

On the trial, the plaintiff in error, the accused, proved that at the time of his alleged second marriage he was, and for many years before had been, a member of the Church of Jesus Christ of Latter-Day Saints, commonly called the Mormon Church, and a believer in its doctrines; that it was an accepted doctrine of that church " that it was the duty of male members of said church, circumstances permitting, to practise polygamy; . . . that this duty was enjoined by different books which the members of said church believed to be of divine origin, and among others the Holy Bible, and also that the members of the church believed that the practice of polygamy was directly enjoined upon the male members thereof by the Almighty God, in a revelation to Joseph Smith, the founder and prophet of said church; that the failing or refusing to practise polygamy by such male members of said church, when circumstances would admit, would be punished, and that the penalty for such failure and refusal would be damnation in the life to come." He also proved " that he had received permission from the recognized authorities in said church to enter into polygamous marriage; . . . that Daniel H. Wells, one having authority in said church to perform the marriage ceremony, married the said defendant on or about the time the crime is alleged to have been committed, to some woman by the name of Schofield, and that such marriage ceremony was performed under and pursuant to the doctrines of said church."

Upon this proof he asked the court to instruct the jury that if they found from the evidence that he " was married as

charged — if he was married — in pursuance of and in conformity with what he believed at the time to be a religious duty, that the verdict must be 'not guilty.' " This request was refused, and the court did charge " that there must have been a criminal intent, but that if the defendant, under the influence of a religious belief that it was right, — under an inspiration, if you please, that it was right, — deliberately married a second time, having a first wife living, the want of consciousness of evil intent — the want of understanding on his part that he was committing a crime — did not excuse him ; but the law inexorably in such case implies the criminal intent."

Upon this charge and refusal to charge the question is raised, whether religious belief can be accepted as a justification of an overt act made criminal by the law of the land. The inquiry is not as to the power of Congress to prescribe criminal laws for the Territories, but as to the guilt of one who knowingly violates a law which has been properly enacted, if he entertains a religious belief that the law is wrong.

Congress cannot pass a law for the government of the Territories which shall prohibit the free exercise of religion. The first amendment to the Constitution expressly forbids such legislation. Religious freedom is guaranteed everywhere throughout the United States, so far as congressional interference is concerned. The question to be determined is, whether the law now under consideration comes within this prohibition.

The word "religion" is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to the history of the times in the midst of which the provision was adopted. The precise point of the inquiry is, what is the religious freedom which has been guaranteed.

Before the adoption of the Constitution, attempts were made in some of the colonies and States to legislate not only in respect to the establishment of religion, but in respect to its doctrines and precepts as well. The people were taxed, against their will, for the support of religion, and sometimes for the support of particular sects to whose tenets they could not and did not subscribe. Punishments were prescribed for a failure to attend upon public worship, and sometimes for entertaining

heretical opinions. The controversy upon this general subject was animated in many of the States, but seemed at last to culminate in Virginia. In 1784, the House of Delegates of that State having under consideration " a bill establishing provision for teachers of the Christian religion," postponed it until the next session, and directed that the bill should be published and distributed, and that the people be requested " to signify their opinion respecting the adoption of such a bill at the next session of assembly."

This brought out a determined opposition. Amongst others, Mr. Madison prepared a " Memorial and Remonstrance," which was widely circulated and signed, and in which he demonstrated " that religion, or the duty we owe the Creator," was not within the cognizance of civil government. Semple's Virginia Baptists, Appendix. At the next session the proposed bill was not only defeated, but another, " for establishing religious freedom," drafted by Mr. Jefferson, was passed. 1 Jeff. Works, 45; 2 Howison, Hist. of Va. 298. In the preamble of this act (12 Hening's Stat. 84) religious freedom is defined; and after a recital " that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty," it is declared " that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." In these two sentences is found the true distinction between what properly belongs to the church and what to the State.

In a little more than a year after the passage of this statute the convention met which prepared the Constitution of the United States." Of this convention Mr. Jefferson was not a member, he being then absent as minister to France. As soon as he saw the draft of the Constitution proposed for adoption, he, in a letter to a friend, expressed his disappointment at the absence of an express declaration insuring the freedom of religion (2 Jeff. Works, 355), but was willing to accept it as it was, trusting that the good sense and honest intentions of the people would bring about the necessary alterations.

1 Jeff. Works, 79.   Five of the States, while adopting the Constitution, proposed amendments.   Three — New Hampshire, New York, and Virginia — included in one form or another a declaration of religious freedom in the changes they desired to have made, as did also North Carolina, where the convention at first declined to ratify the Constitution until the proposed amendments were acted upon.   Accordingly, at the first session of the first Congress the amendment now under consideration was proposed with others by Mr. Madison.   It met the views of the advocates of religious freedom, and was adopted. Mr. Jefferson afterwards, in reply to -an address to him by a committee of the Danbury Baptist Association (8 id. 113), took occasion to say : " Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the government (reach actions only, and not opinions, —+ I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should ' make no law respecting an establishment of religion or prohibiting the free exercise thereof,' thus building a wall of separation between church and State.   Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore man to all his natural rights, convinced he has no natural right in opposition to his social duties."   Coming as this does from an acknowledged leader of the advocates of the measure, it may be accepted almost as an authoritative declaration of the scope and effect of the amendment thus secured.   Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.

Polygamy has always been odious among the northern and western nations of Europe, and, until the establishment of the Mormon Church, was almost exclusively a feature of the life of Asiatic and of African people.   At common law, the second marriage was always void (2 Kent, Com. 79), and from the earliest history of England polygamy has been treated as an offence against society.   After the establishment of the eccle-

siastical courts, and until the time of James I., it was punished through the instrumentality of those tribunals, not merely because ecclesiastical rights had been violated, but because upon the separation of the ecclesiastical courts from the civil the ecclesiastical were supposed to be the most appropriate for the trial of matrimonial causes and offences against the rights of marriage, just as they were for testamentary causes and the settlement of the estates of deceased persons.

By the statute of 1 James I. (c. 11), the offence, if committed in England or Wales, was made punishable in the civil courts, and the penalty was death. As this statute was limited in its operation to England and Wales, it was at a very early period re-enacted, generally with some modifications, in all the colonies. In connection with the case we are now considering, it is a significant fact that on the 8th of December, 1788, after the passage of the act establishing religious freedom, and after the convention of Virginia had recommended as an amendment to the Constitution of the United States the declaration in a bill of rights that " all men have an equal, natural, and unalienable right to the free exercise of religion, according to the dictates of conscience," the legislature of that State substantially enacted the statute of James I., death penalty included, because, as recited in the preamble, " it hath been doubted whether bigamy or poligamy be punishable by the laws of this Commonwealth." 12 Hening's Stat. 691. From that day to this we think it may safely be said there never has been a time in any State of the Union when polygamy has not been an offence against society, cognizable by the civil courts and punishable with more or less severity. In the face of all this evidence, it is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life. Marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal. In fact, according as monogamous or polygamous marriages are allowed, do we find the principles on which the government of

the people, to a greater or less extent, rests. Professor Lieber says, polygamy leads to the patriarchal principle, and which, when applied to large communities, fetters the people in stationary despotism, while that principle cannot long exist in connection with monogamy. Chancellor Kent observes that this remark is equally striking and profound. 2 Kent, Com. 81, note (*e*). An exceptional colony of polygamists under an exceptional leadership may sometimes exist for a time without appearing to disturb the social condition of the people who surround it; but there cannot be a doubt that, unless restricted by some form of constitution, it is within the legitimate scope of the power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion.

In our opinion, the statute immediately under consideration is within the legislative power of Congress. It is constitutional and valid as prescribing a rule of action for all those residing in the Territories, and in places over which the United States have exclusive control. This being so, the only question which remains is, whether those who make polygamy a part of their religion are excepted from the operation of the statute. If they are, then those who do not make polygamy a part of their religious belief may be found guilty and punished, while those who do, must be acquitted and go free. This would be introducing a new element into criminal law. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?

So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief?

To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.

A criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does. Here the accused knew he had been once married, and that his first wife was living. He also knew that his second marriage was forbidden by law. When, therefore, he married the second time, he is presumed to have intended to break the law. And the breaking of the law is the crime. Every act necessary to constitute the crime was knowingly done, and the crime was therefore knowingly committed. Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law. The only defence of the accused in this case is his belief that the law ought not to have been enacted. It matters not that his belief was a part of his professed religion : it was still belief, and belief only.

In *Regina* v. *Wagstaff* (10 Cox Crim. Cases, 531), the parents of a sick child, who omitted to call in medical attendance because of their religious belief that what they did for its cure would be effective, were held not to be guilty of manslaughter, while it was said the contrary would have been the result if the child had actually been starved to death by the parents, under the notion that it was their religious duty to abstain from giving it food. But when the offence consists of a positive act which is knowingly done, it would be dangerous to hold that the offender might escape punishment because he religiously believed the law which he had broken ought never to have been made. No case, we believe, can be found that has gone so far.

6. As to that part of the charge which directed the attention of the jury to the consequences of polygamy.

The passage complained of is as follows : "I think it not improper, in the discharge of your duties in this case, that you should consider what are to be the consequences to the innocent victims of this delusion. As this contest goes on, they multiply,

and there are pure-minded women and there are innocent children, — innocent in a sense even beyond the degree of the innocence of childhood itself.  These are to be the sufferers ; and as jurors fail to do their duty, and as these cases come up in the Territory of Utah, just so do these victims multiply and spread themselves over the land."

While every appeal by the court to the passions or the prejudices of a jury should be promptly rebuked, and while it is the imperative duty of a reviewing court to take care that wrong is not done in this way, we see no just cause for complaint in this case.  Congress, in 1862 (12 Stat. 501), saw fit to make bigamy a crime in the Territories.  This was done because of the evil consequences that were supposed to flow from plural marriages.  All the court did was to call the attention of the jury to the peculiar character of the crime for which the accused was on trial, and to remind them of the duty they had to perform.  There was no appeal to the passions, no instigation of prejudice.  Upon the showing made by the accused himself, he was guilty of a violation of the law under which he had been indicted: and the effort of the court seems to have been not to withdraw the minds of the jury from the issue to be tried, but to bring them to it; not to make them partial, but to keep them impartial.

Upon a careful consideration of the whole case, we are satisfied that no error was committed by the court below.

*Judgment affirmed.*

MR. JUSTICE FIELD.  I concur with the majority of the court on the several points decided except one, — that which relates to the admission of the testimony of Amelia Jane Schofield given on a former trial upon a different indictment.  I do not think that a sufficient foundation was laid for its introduction.  The authorities cited by the Chief Justice to sustain its admissibility seem to me to establish conclusively the exact reverse.

NOTE. — At a subsequent day of the term a petition for a rehearing having been filed, MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Since our judgment in this case was announced, a petition for rehearing has been filed, in which our attention is called to the fact that the sentence of the

court below requires the imprisonment to be at hard labor, when the act of Congress under which the indictment was found provides for punishment by imprisonment only.  This was not assigned for error on the former hearing, and we might on that account decline to consider it now ; but as the irregularity is one which appears on the face of the record, we vacate our former judgment of affirmance, and reverse the judgment of the court below for the purpose of correcting the only error which appears in the record, to wit, in the form of the sentence.  The cause is remanded, with instructions to cause the sentence of the District Court to be set aside and a new one entered on the verdict in all respects like that before imposed, except so far as it requires the imprisonment to be at hard labor.