Joseph F. KELLER, A Minor, Individually and on behalf of all others similarly situated, by His Father and Next Friend, Raymond J. KELLER, Plaintiff,

v.

GARDNER COMMUNITY CONSOLIDATED GRADE SCHOOL DISTRICT 72C, an Illinois Municipal Corporation; Robert Poole, James Larson, Ramona Storm, George Bexson, Sandra Sowers, Mary Chladek, and Steve Perry, Individually and as Members of the Board of Education of Gardner Community Consolidated Grade School District 72C; Donald Morris, Individually and as Superintendent of Gardner Community Consolidated Grade School District 72C; and Mark Lamping, Individually and as an Employee of Gardner Community Consolidated Grade School District 72C, Defendants.

No. 81 C 1858.

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1982.

Roger B. Gomien, Gomien, Masching & Neville, Ltd., Dwight, Ill., Ronald V. Hirst, Towanda, Ill., William Fitzpatrick, Evergreen Park, Ill., for plaintiff.

William W. Kurnik, Judge, Drew, Cipolla & Kurnik, Ltd., Park Ridge, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

This case presents a conflict between a public grade school coach's policy requiring attendance at basketball practice and a student's desire to attend religion classes during the time designated for team practice. The eleven year old plaintiff, Joseph Keller, a resident of Gardner, Illinois, and a member of the Gardner Grade School basketball team, represented by his parents, challenges the constitutionality of a rule of the school's basketball coach which authorized absences from basketball practice in only two situations: because of the player's illness or because of a death in the player's family. The penalty imposed for an unexcused absence is that the student player would not be allowed to "suit up" for the next scheduled game.

Keller attends catechism class once each week at a Catholic church located outside of the limits of the Gardner School District, in Dwight, Illinois. The catechism class is scheduled by the church for the same time period during which the regularly scheduled practice of the basketball team is held. The basketball program was instituted after Joseph had started catechism classes, but oblivious of the schedule of the church. The coach would not make an exception in his rule for Joseph. Both sides have moved for summary judgment.

In Count I of his complaint, Keller asserts that this rule violates his right to freedom of religion. In his other two counts, he blanchly alleges, as so often happens in cases of this type, other constitutional claims. He argues in Count II that the rule deprives him of due process of law, because, he says, it is arbitrary and does not have a rational relationship to a legitimate

school objective. For reasons fully explained later in this opinion, however, the rule does have a relevant rational basis and as a result the due process claim is without substance. In Count III, he asserts that the rule deprives him of equal protection of the law in that it creates of him and others, who attend catechism classes one afternoon a week, a class discriminated against because of their religious practices. Arguing in the alternative, also under Count III, the plaintiff asserts that the coach's policy violates his right to equal protection, because it applies to boys' athletic activities and not to girls'. These equal protection claims are not established, however, because Keller has failed to allege a discriminatory purpose as required by the Supreme Court in *Personnel Administrator v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979), or to rebut the evidence that an unexcused absence rule also applied to girls' athletics. Summary judgment, in favor of the defendant, is therefore appropriate with respect to Counts II and III of the plaintiff's complaint: the due process and equal protection claims.

The only question remaining is whether the coach's rule violates the plaintiff's right to freedom of religion. It has long been established that the first amendment rights are not absolute, and this includes particularly the right to the free exercise of religion. *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879) (party's religious belief not justification for committing a criminal act of bigamy); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (upholding statute which proscribed the sale, by a minor, of any article in a public place, despite the fact that members of the Jehovah's Witness faith believed that it was their religious duty to perform such work); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (Sunday closing laws not violative of right of Orthodox Jews to free exercise of religion); *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (exception for conscientious objector to all wars in Selective Service Act not violative of free exercise of religion rights of plaintiff who claimed that religious convictions prevented him from participating in only unjust wars).

The Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and subsequent cases, has followed a balancing approach to be applied in cases where a free exercise of religion claim is made based on the denial of a government benefit. This entails comparing the burden on the individual who is denied the benefit because of religious practice, with the burden that would be imposed on the government if it extended the benefit to someone who because of their religious practice failed to meet a generally imposed requirement for eligibility for the benefit. *See Moshe Menora, et al., v. Illinois High School Association, et al.,* 683 F.2d 1030 at 1032 (7th Cir.1982).

Following this balancing approach, we first must consider the sincerity of the religious claim being advanced by Keller and the degree to which the challenged regulation interferes with religious belief or a vital religious practice based upon a belief. It is common knowledge that a catechism class such as that the plaintiff attends is a program of religious instruction, the purpose of which is to teach Catholic children the fundamental principles of their religion. Although an integral part of a Catholic's practices may be to learn the laws and rituals of the Catholic faith, and during certain stages of a practitioner's life the church may require a particular degree of knowledge of the religion, it is not mandatory that a fifth grade child attend a formal catechism class. It would be sufficient for the student to learn the tenets of the Catholic faith directly from a priest or from some other member of the church community. Further, the actual teaching of the religious doctrine, while subject to variance among different diocese, is substantially the same.

Keller admits that catechism classes are conducted by another Catholic church in the vicinity of the Gardner School District, which do not differ materially from the

catechism classes offered in Dwight, and which do not pose scheduling conflicts with the school's basketball program. His conduct in attending catechism classes only in Dwight is a matter of personal preference stemming from his familiarity with a particular catechism class and its teachers. It cannot be said that the plaintiff has been denied the opportunity to participate in scheduled games because of conduct mandated by religious belief or necessity. Keller has not established an interference with his free exercise of religion, but only with his selection of a church in which it may be pursued. At the most, he has established only an excusable and de minimus burden upon his religious practice.

Next we must weigh on the other side of the balance the importance to the school of the secular values underlying the coach's rule. Since the beginning of public elementary education in the United States, it has been recognized that participation in athletics plays an important role in the development of the child. Athletics train the body as well as the mind and are as important in the child's development as regular classroom work. The Illinois Constitution mandates that the respondent Board of Education provide an educational program that goes beyond the "three R's". As was stated by the Committee on Education of the constitutional convention for the 1970 revision of the Illinois Constitution (*see* Constitutional Commentary by Helman and Whalen, Ill.Ann.Stat. Constitution Art. X, § 1 (Smith-Hurd 1971)) "[t]he first paragraph of [Section 1] . . . constitutes a broad statement of purpose and emphasizes the importance of education. The educational enterprise greatly benefits the individuals whose vocational skills are enhanced, whose cultural levels are lifted, and whose abilities for useful service are enlarged." *Id.* at p. 255. The first paragraph of Section 1 reads as follows, "[a] fundamental goal of the People of the State is the educational development of all persons *to the limits of their capacities*" [emphasis added]. Ill. Const. of 1970, Art. X, § 1. Article 27 of Chapter 122 of the Illinois Statutes sets out in detail the requirement that the public schools pro-

vide for the education of children through programs other than just traditional academics, "in order to provide an educated and useful citizenry, encourage intellectual development and foster appreciation for and active participation in" such activities as include music, the arts, physical education and sports. Ill.Ann.Stat. Ch. 122, § 27–1 (Smith-Hurd 1962 & Supp.1982). And subsection 7 of this article declares that "courses in physical education and training shall be for the following purposes: (1) to develop organic vigor; (2) to provide bodily and emotional poise; (3) to provide neuro-muscular training; (4) to prevent or correct certain postural defects; (5) to develop strength and endurance; (6) to develop desirable moral and social qualities; [and] (7) to promote hygienic school and home life." *Id.* § 27–7. For these purposes, school districts are authorized to provide programs and facilities including gymnasiums and even stadiums and to enter into arrangements with the Illinois High School Association for interscholastic sports competition. The coach here, for example, is a regular school teacher.

The school has a significant interest in administering these programs effectively. The primary importance of the rule to the school program is that the rule promotes attendance at practice and as a result instills in young athletic participants a sense of teamwork and an appreciation of the individual's responsibility to the group. Promoting these qualities in each individual should be part of every elementary school education.

We must also pause to consider, as part of this balancing process, the impact on the basketball program of an alternative to the current school policy. An alternative scheduling arrangement would not be appropriate because the school could not successfully pre-arrange a practice schedule that would accommodate the religious education class of each of the many participants in the athletic program. And it would be unfair to allow a special exemption to the attendance rule for the benefit of those students who opt to observe their

special religious classes, while disallowing similar exemptions for attending other activities to students who may not be adherents to a particular religious organization. Either alternative would be unworkable and ultimately would defeat the athletic program. Clearly the burden imposed on the school if it were forced to change its rule to accommodate Keller is considerable.

It should be recognized that under certain circumstances exemptions must be permitted to all members of a particular religious sect in order to preserve freedom of religious belief. This is the principle of the Supreme Court decisions in the line of cases following *Sherbert.* The boundary is a narrow one between an exemption from a universal requirement in deference to a particular basic religious belief on the one hand and on the other hand a special preference given because of a discretionary religious practice. The latter is not favored. *Cf. McDaniel v. Paty,* 435 U.S. 618, 626–27, 98 S.Ct. 1322, 1327, 55 L.Ed.2d 593 (1978) (where the provision of statute was aimed at an act, not a belief, the prohibition against infringement of "freedom to believe" not violated by its enforcement). The difference between the two concepts as they have developed in our history is easily seen in reviewing the language of the more fully worded religious freedom provision of the Illinois Constitution, which states, "nor shall any preference be given by law to any religious denomination or mode of worship". Ill. Const. of 1970, Art. 1 § 3. The same provision was included word for word in the Illinois Constitutions of 1818, 1848, and 1870. The concept enunciated seeks to effect a complete but accommodable separation of church and state. *See generally,* Kurland, *Of Church and State and the Supreme Court,* 29 U.Chi.L.Rev. 1 (1961). The granting of an exemption, in this case, is closer to the granting of a preference to a discretionary religious practice, as differing from a religious belief, and would tend to be violative of the letter and the spirit of the first amendment.

The plaintiff has failed to establish the uniqueness of the catechism program in Dwight, Illinois and as a result he is unable to show that the burden on his free exercise of religion, if there is an interference at all, outweighs the burden that would be imposed upon the school were it to change its policy regarding unexcused absences. Balancing the interests involved, it appears unreasonable for the school to have to accommodate its basketball program to the petitioner's personal schedule or preference.

In his final plea in this matter, the plaintiff has cited the recent decision of the Court of Appeals of this circuit, *Moshe Menora, et al. v. Illinois High School Assoc., et al.,* 683 F.2d 1030 (7th Cir.1982). Plaintiff argues that this case stands for the proposition that the school must have a compelling reason for its unexcused absence policy. The Court of Appeals, however, did not apply a compelling interest standard in the *Moshe Menora* decision, and the language of the Court of Appeals suggests that it would apply a lesser standard in a case such as this, where the government policy is not unduly burdensome on the petitioner's exercise of religion. Following what I believe to be the import of the *Moshe Menora* decision, I find that the rule in question has the requisite rational basis as illustrated by the secular importance of the rule to the school's educational goals.

I conclude that here the policy of the grade school regarding unexcused absences survives the free exercise challenge of the petitioner. Accordingly and for the reasons set out above, summary judgment in favor of the defendants must be allowed as to all counts of the plaintiff's complaint. It is so ordered.