IN THE SUPREME COURT OF THE STATE OF DELAWARE

NOAH SHARP,                          §
                                     §
    Defendant Below          §    No. 64, 2023
    Appellant,               §
                                     §    Court Below—Superior Court
                                     §    of the State of Delaware
        v.                    §
                                     §    Cr. ID No. 2010002207 (N)
STATE OF DELAWARE,                   §
                                     §
    Appellee.                §

Submitted: April 10, 2024
Decided:   July 1, 2024

Before **SEITZ**, Chief Justice; **VALIHURA, TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices constituting the Court *en banc*.

**ORDER**

This 1st day of July, 2024, it appears to the Court that:

(1)    In October 2022, Noah Sharp stood trial in the Superior Court and was found guilty of murder in the first degree, possession of a deadly weapon during the commission of a felony, and conspiracy in the first degree.  After the court sentenced Sharp to life plus 28 years in prison, he appealed to this Court.

(2)    Sharp raises a single issue.  He claims that he was not afforded a trial by an impartial jury because the trial court refused to strike a juror who, after hearing counsel's opening statements, came forward and admitted to some passing familiarity with the murder.

(3)     The murder, which received a considerable amount of publicity in New Castle County, occurred two years before Sharp's trial. The victim—Madison Sparrow—was an eleventh grader at Newark Charter High School, from which Sharp had graduated in June 2020. Sparrow and Sharp had dated when Sparrow was in the ninth grade, but Sparrow eventually broke off the relationship.

(4)     Sparrow had been friends with Sharp's codefendant and coconspirator, Annika Stalczynski, who also attended Newark Charter. After Sparrow broke up with Sharp, Sharp began to spend time with Stalczynski. Sharp, who was troubled by the breakup, convinced Stalczynski that Sparrow had been speaking poorly of her and even wanted to fight her. Although these reports did not cause Stalczynski to "hate" Sparrow, she admitted that she "didn't like" her.[1]

(5)     Sharp and Stalczynski's shared disdain for Sparrow somehow devolved into a conspiracy to kill her. On October 2, 2020, under the guise of walking with Sparrow to get some ice cream, Stalczynski led Sparrow down a trail in a wooded area behind an elementary school in Newark. Sharp was lying in wait there with a baseball bat. According to Stalczynski's testimony at Sharp's trial, when Sparrow saw Sharp, she was "shocked."[2] Stalczynski added that "[Sharp] came out and just

---

[1] App. to Opening Br. at A613.
[2] *Id*. at A622.

2

started swinging the bat . . . connecting with her body . . . . [Sharp] started hitting on [Sparrow's] side over and over again. And she fell."[3]

(6) After Sparrow fell, Sharp continued to bludgeon her with the bat, now "[i]n her head."[4] Sparrow died from her wounds, and Sharp and Stalczynski buried her body in a shallow grave under an Interstate 95 overpass in Newark.

(7) Before the jury was selected for Sharp's trial, the trial court conducted its examination of the array of prospective jurors. Among other things, the court gave a brief description of the charges and asked the prospective jurors two important questions:

> We're about to select the jury in the case of State of Delaware vs. Noah Sharp. This is a criminal case and the charges against the defendant are murder first degree, possession of a deadly weapon during the commission of a felony, and conspiracy first degree.
>
> It is alleged that the offenses occurred in Newark, Delaware, on or about October 2, 2020. . . .
>
> Do you know anything about this case through personal knowledge, discussion with anyone, the news media, including social media, or any other sources? Do you know the defendant, Noah Sharp, Annika Stalczynski, Madison Sparrow, or any of their friends or relatives?[5]

(8) This description of the charges and the identification of Sharp, Stalczynski, and Sparrow as the central characters in the case did not prompt the prospective juror, eventually seated as Juror No. 8, to come forth and make any

---

[3] *Id.*
[4] *Id.*
[5] *Id.* at A21.

disclosures to the court. But that changed after counsel's opening statements and the first prosecution witness—Sparrow's mother—began to testify.

(9) During a recess, the trial judge reported to counsel that Juror No. 8 informed a bailiff that "he has heard some discussions . . . about the case."[6] The trial judge reported further that "[a]pparently [the prosecutor's] opening statement rang a few bells. Otherwise, he had no clue about it."[7] This prompted the trial judge to question Juror No. 8 at sidebar with counsel present.

(10) During the court's questioning, Juror No. 8 disclosed that:

   a.    he did not recognize any of the names mentioned by the court during voir dire;[8]

   b.    he resided "in the heart of Newark"[9] and knew families with children who attended Newark Charter;

   c.    he did not realize that he was familiar with some of the facts surrounding the case until he heard counsel's opening statements;

   d.    his wife, who followed the relevant events on social media, had told him "all about what was going on[]"[10] two years earlier;

---

[6] *Id*. at A292.
[7] *Id*.
[8] In addition to naming Sparrow, Sharp, and Stalczynski and identifying counsel by name, the court named more than fifty potential witnesses.
[9] *Id*. at A293.
[10] *Id*. at A294.

4

e.      he recalled hearing, two years earlier, "pieces of what he heard this morning[], that[] this girl was killed in the woods . . . [and] there was . . . a couple people involved. . . ."[11]

f.      he "would like to think [he could] be impartial."[12]

(11)   The court questioned Juror No. 8 further about how his limited pretrial exposure to information relating to Sharp's case might affect his impartiality:

> THE COURT:  So based on what you heard back then, do you recall forming an opinion about the defendants and whether they were guilty or not guilty?
>
> JUROR 8:  I would say that you get feelings, not necessarily an opinion.  But you see a very one-sided series of posts and stories and know people that are posting things kind of on, you know, team Madison, right.  So like the candlelight vigils and things like that.  But you don't know  - -
>
> THE COURT:  Did you participate in any of that or  - -
>
> JUROR 8:  No I did not.  Nobody in my family did.
>
> THE COURT:  So you have some impressions I guess it's fair to say or - -
>
> JUROR 8:  Right . . . . I mean it's that whole unconscious bias, right.  Like I'm coming into it having heard some things a couple of years ago.
> . . .
>
> THE COURT:  So, . . . the question is not whether you really heard about the case.  The question is whether you formed opinions or not and whether you can - - if you have formed an

[11] *Id.*
[12] *Id.*

5

opinion, set aside that opinion and base your verdict on what you hear in the courtroom because everybody is entitled to a fair trial, both the defense and the State . . . .

So what are your thoughts about your ability to do that, if you have any?

JUROR 8: I mean, I think I'm okay. So . . . a lot of what I do for work is very analytical, right. I'm an engineer. I trouble shoot equipment and stuff like that. So it's really compartmentalizing information. So, you know, I'm very aware of kind of taking what's present now and using that only and not trying to build from the past.[13]

(12) Based upon this exchange, Sharp's counsel moved to strike Juror No. 8. The court denied the motion, noting that the juror's exposure to the information occurred two years earlier. The court also "was impressed with his candor and . . . way of explaining things,"[14] including his awareness of the possibility of unconscious bias. One last exchange is worth quoting here:

THE COURT: . . . He's an engineer, as he said, and gives him the mindset of being able to sort of put things in a particular cubbyhole or pigeonhole them and sort of not allow other things to enter into the consideration. And he said he can do it and I have no reason to doubt that.

The test is, as I said, not whether somebody knows about something or heard about something, but whether you have an opinion they can't set aside and he doesn't have an opinion, so I'm going to allow him to remain.

Okay. [Juror No. 8], you don't have to sit down. You can go back to the jury room and continue on with the trial.

---

[13] *Id*. at A295–97.
[14] *Id.* at A302.

6

JUROR 8:  Awesome.  Thank you all very much.[15]

(13)   Sharp now accuses Juror No. 8 of improperly withholding material information during jury selection.  He argues further that the court committed reversible error by allowing Juror No. 8 to remain on the jury.

(14)   We afford deference to a trial judge's decision not to remove a juror for cause.[16]  As this Court observed in *Schwan v. State*, "[t]he deference given to such determinations on appeal is based upon the judge's ability to assess the veracity and credibility of the potential juror."[17]  A trial judge's finding, after due inquiry, that a juror can evaluate the evidence impartially will not be set aside by a reviewing court, absent manifest error.[18]  Under that standard, this is not a close call.

(15)   We find no justification for Sharp's accusation that Juror No. 8's failure to come forward during the court's voir dire examination of the array was a product of dishonesty or lack of candor.  It is evident from the record that Juror No. 8's recollection of his tangential contact with the facts of the case was not jogged until he heard the prosecution's opening statements.  During the luncheon recess, which was the first recess after opening statements, Juror No. 8 informed a bailiff of his

---

[15] *Id.* at A302–03.  Sharp deems this response—Juror No. 8's use of the overused and arguably misused "awesome"—to be indicative of the juror's bad faith.  Delaware Supreme Court, *Oral Argument Video*:  *Sharp v.* State, at 8:50–9:01 (Apr. 10, 2024) (https://vimeo.com/932917683).  As we understand the record, this interpretation lacks any persuasive force.
[16] *Schwan v. State*, 65 A.3d 582, 590 (Del. 2013).
[17] *Id.* at 589.
[18] *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 156 (1878)).

realization that he, in fact, did possess some, albeit very limited, knowledge about the case based on conversations with this wife two years earlier. The bailiff promptly reported this to the trial judge, who in turn notified counsel and engaged in the colloquy with the juror as recounted above. Juror No. 8 did the right thing, and it is unfortunate in our view that he now stands accused of malfeasance.

(16) Nor has Sharp identified any manifest error in the trial court's denial of his motion to remove Juror No. 8 from the jury. The trial judge appropriately inquired into the basis and depth of the juror's prior knowledge of the case and his ability to evaluate the evidence impartially. Given that the trial judge was in a position to assess Juror No. 8's veracity and credibility and we are not, we defer to his determination.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

8