**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEIF THURSTON CARLSON, SR.,
  *Petitioner-Appellant*,

v.

ATTORNEY GENERAL OF THE STATE
OF CALIFORNIA,
  *Respondent-Appellee.*

No. 13-16535

D.C. No.
3:11-cv-02976-
CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, Senior District Judge, Presiding

Argued and Submitted
November 20, 2014—San Francisco California

Filed June 26, 2015

Before: Marsha S. Berzon and Johnnie B. Rawlinson,
Circuit Judges and Elaine E. Bucklo,[*] Senior District
Judge.

Opinion by Judge Berzon

---

   [*] The Honorable Elaine E. Bucklo, Senior District Judge for the U.S. District Court for the Northern District of Illinois, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's denial of Leif Carlson, Sr.'s habeas corpus petition challenging his conviction for willful infliction of harm or injury to a child, in a case in which the trial court, invoking the forfeiture-by-wrongdoing doctrine, determined that Carlson had surrendered his Sixth Amendment right to confront his wife and son who did not appear in court but whose statements were admitted through the testimony of a police officer.

The panel held that Supreme Court authority clearly establishes that the forfeiture-by-wrongdoing doctrine applies where there has been affirmative action on the part of the defendant that produces the desired result, non-appearance by a prospective witness against him in a criminal case; and that simple tolerance of, or failure to foil, a third party's previously express decision either to skip town himself rather than testifying or to prevent another witness from appearing is not a sufficient reason to foreclose a defendant's Sixth Amendment confrontation rights at trial.

The panel held that because the trial court could have reasonably inferred on the record before it that Carlson directly participated in securing his wife's and son's absence, and because Supreme Court authority permits application of the forfeiture-by-wrongdoing exception in such circumstances, admission of their statements was not an

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

objectively unreasonable application of Supreme Court precedent.

**COUNSEL**

Mark McBride (argued), Kavinoky Law Firm, Encino, California, for Petitioner-Appellant.

Jill M. Thayer (argued), Deputy Attorney General; Kamala D. Harris, Attorney General; Gerald A. Engler, Senior Assistant Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General, San Francisco, California, for Respondent-Appellee.

**OPINION**

BERZON, Circuit Judge:

One early Sunday afternoon, Joshua Barragan ("Joshua") called the Moraga Police Department to report that his step-father, Leif Carlson, Sr. ("Carlson"), had hit seven-year-old Leif Carlson, Jr. ("Leif Jr.") in the face. When Officer Ronald Ward arrived on the scene, he observed redness and bruising on Leif Jr.'s left cheek. The state charged Carlson—Leif Jr.'s father—with willful infliction of harm or injury to a child, Cal. Penal Code § 273a(b).

The case went to trial. Carlson's wife, Lena Carlson ("Lena"), and Leif Jr. were subpoenaed to testify but never appeared in court. Invoking the Supreme Court's forfeiture-by-wrongdoing doctrine, the trial court determined that Carlson was complicit in their absence, and that he had

surrendered his Sixth Amendment right to confront them. Accordingly, the trial judge allowed Officer Ward to testify to statements made by Leif Jr. and Lena in the hours after the incident.

Carlson was convicted and sentenced to ten days' jail time and four years' probation. The Appellate Division affirmed the judgment, the Court of Appeal denied a petition for writ of mandate, and the California Supreme Court denied habeas relief. Carlson then timely filed a federal habeas petition. *See* 28 U.S.C. § 2254. The district court denied the petition, concluding that the trial court's determination that Carlson forfeited his Confrontation Clause rights was not an unreasonable application of the Supreme Court's forfeiture-by-wrongdoing doctrine as articulated in *Giles v. California*, 554 U.S. 353 (2008).

We affirm. Simple acquiescence in another's wrongful conduct designed to keep a witness from testifying does not amount to forfeiture by wrongdoing. But the state court's ruling on the forfeiture question, while murky, is consistent with a finding that Carlson engaged in more culpable conduct. The evidence supporting such a finding was not trifling. Under the highly deferential standard of review required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we can grant habeas relief only if we find that the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent, or that the factual findings on which the decision relied were unreasonable in light of the evidence. 28 U.S.C. § 2254(d). Because we cannot say that the state court's decision was unreasonable under that standard, we must affirm the denial of the habeas petition. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## I. BACKGROUND

### A.  The Incident

The incident underlying Carlson's conviction occurred while Carlson was supervising Leif Jr.'s guitar practice.  The two were tired, having arrived home earlier that morning from Cub Scouts camp.  According to Carlson's testimony, when he attempted to correct Leif Jr.'s hand positioning, Leif Jr. started yelling, "literally screaming in [Carlson's] ear."  Carlson struck Leif Jr. on the left cheek with the back of his hand or with his fist.  Leif Jr. began to cry.

Joshua—one of three Carlson stepchildren living with Carlson and his wife—called the police.  Officer Ward of the Moraga Police Department arrived on the scene, briefly questioned the family, and then placed Carlson under arrest.  After securing Carlson in his car, Ward returned to the house to take further statements from Leif Jr. and his mother, Lena.  It is the admissibility of these statements, detailed below, that underlies this appeal.

Carlson was charged with willful infliction of harm or injury to a child, Cal. Penal Code § 273a(b), an offense that requires, the jury was instructed, proof that "the defendant wilfully inflicted unjustifiable physical pain or mental suffering on a child," and that he "did not act while reasonably disciplining a child."

### B.  Pre-Trial Proceedings

The trial was set for Thursday, July 9, 2009, in the Contra Costa County Superior Court.  Carlson did not appear.  An order to show cause for non-compliance issued, and trial was

reset for Tuesday, July 14th.[1]  Subpoenas were issued for Lena and Leif Jr. to appear as witnesses.  One subpoena was addressed to Lena, instructing her to bring her son to court, and the other to Leif Jr. and "parent."

On Tuesday, July 14, Carlson appeared, accompanied by Lena but not Leif Jr.  Judge Grossman, presiding, asked Lena why she had not brought her son to court, inquiring whether she had received the subpoenas.[2]  Lena stated that she had observed an officer hand her husband some documents on July 10th; the officer had been waiting for the Carlsons when they pulled into the driveway upon return from their vacation. Carlson "told [her] not to worry about it."  She did not specify whether she saw the subpoenas, or whether she knew Leif Jr.'s presence in court was demanded, but she confirmed that she was present "pursuant to the subpoena."  The judge told her that unless she produced her son the next morning, she would be in contempt of court.

---

[1] Carlson's attorney appeared, but Carlson, Lena, and Leif Jr. were on vacation in Alaska.  Carlson had earlier unsuccessfully moved to postpone the trial to accommodate the vacation.  Carlson had been directed to bring his son with him to court that day, although his counsel had argued previously, and argued again at the July 9th appearance, that it was inappropriate to require a defendant to bring an adverse witness to testify against him.

[2] The case was initially assigned to a different judge, Judge Hinton. Carlson's counsel later summarized these proceedings before Judge Hinton to Judge Grossman.  He reported that Judge Hinton "said she did not feel it was worth the trauma of bringing the child to court for this case, and, therefore, she felt it was in the interest of justice that the case should be dismissed."  According to Carlson's counsel, the district attorney "objected," and the case was transferred to Judge Grossman for proceedings that same day.

Lena did not appear on Wednesday morning. Neither did her son. The court thereupon issued a warrant for her detention. Recognizing the issue that would arise if Lena and Leif Jr. did not appear (and, indeed, they never appeared over the remaining three days of trial), the judge noted the possibility that Carlson had forfeited his Sixth Amendment right to confront them. Judge Grossman indicated that if he found Carlson was "somewhat complicit" in or "encourage[ed]" his wife and son's absence, he would allow their statements to Officer Ward to be introduced for the truth of the matter asserted.

To aid in determining Carlson's complicity, the court called Officer Daniel Lynch to the stand. Officer Lynch had been to the Carlson home earlier that day, to transport Carlson's stepson Joshua to court. Lynch testified that Joshua told him Carlson, Lena, and Leif Jr. had not come home Tuesday night—that is, after Lena had been instructed to produce Leif Jr. the next day, under penalty of contempt. Over Carlson's hearsay objection, Lynch also testified that Joshua reported that his brother Christian, another of Carlson's stepsons, told him that their mother had said "she was leaving the area . . . and not to call her." After Lynch's testimony, the judge told the parties that he was "not prepared to make a finding. . . at this time that Mr. Carlson is somehow complicit in all this."

## C. Evidentiary Hearing

By the next morning, however, the judge had switched gears. He announced his intention to revisit the forfeiture-by-wrongdoing question by conducting an evidentiary hearing.

At the outset of the hearing, the state called Christian to the stand.  Christian testified that on Tuesday, the first day of trial, Lena had been "really freaked out" about coming to court and had done so only in response to his coaxing.  When asked what his mother was scared of, Christian responded that "[s]he did not want [Leif Jr.] to testify," and that he was under the impression that "she thought it would be extremely traumatizing for him."

Christian went on to report that Lena never came home Tuesday night.  Carlson did, but only briefly.  While at home, he told Christian that his mother was "really stressed out"and "was going to be somewhere else for a while," and that the kids were not to call her.  By the time of his Thursday testimony, Christian had not seen Lena or Leif Jr. since the trial began.  Carlson had stopped at home again on Wednesday evening, but, once more, did not stay the night.

On cross-examination, Christian reported that Lena was currently receiving treatment for anxiety, and possibly for bipolar disorder.  He described Carlson's relationship with Leif Jr. as a very good one—the two were "pretty much as close as can be for father and son," he testified.  Carlson and Joshua, however, did not get along.

Before Christian's testimony, Carlson's counsel had informed the court of an interchange between Lena and Judge Hinton, the judge initially assigned to the case.  Lena, counsel recounted, had told Judge Hinton she "had no intention of bringing the child to court," despite orders to do so.  Judge Grossman expressed surprise and frustration that no one had informed him of that statement before.  At the end of the evidentiary hearing, the judge remarked that, based on all he had heard, he did not think the forfeiture-by-wrongdoing

exception applied, as "it would be difficult" to find that Carlson "took actions with specific intent to make Lena Carlson and Leif Carlson unavailable." The case then proceeded to trial.

### D. Trial

The state's principal witnesses were Joshua and Officer Ward. Joshua, who acknowledged that he did not get along with his stepfather, testified that on October 12th, 2008, he was in the midst of doing laundry when he heard a "smacking" noise and then heard Leif Jr. crying, "Why did you punch me?" The judge instructed the jury that Leif Jr.'s statement could be considered only for Joshua's state of mind. Joshua entered the room where Carlson was helping Leif Jr. with his guitar practice and saw that Leif Jr.'s face was red on the left side. When Joshua tried to comfort his half-brother, Carlson intervened, telling him it was "none of [his] business" that he had "the power to kick [him] out." Several hours later Joshua called the police.

Officer Ward testified that on the day of the incident, he met Joshua at a parking lot near the Carlson home, as arranged by the police dispatcher. Ward went on to state—over Carlson's objection to the statements as double hearsay—that Joshua had reported encountering his younger brother crying and saying "daddy punched me, daddy punched me."

Officer Ward's testimony continued as follows: Ward went to the Carlson home, where he observed Leif Jr. with a red and lightly bruised cheek. Ward thought Leif Jr.'s condition consistent with "some type of closed fist contact." He also described Leif Jr.'s timid appearance and his apparent

relief when his father was taken from the home. Lena was nervous but cooperative.

When Ward informed Carlson that he was under arrest, Carlson asked,"For what? . . . What are you doing? It was an accident. My hand slipped. I did not mean to hit him with the back of my hand." Later, after he was given Miranda warnings, Carlson said "I just wanted to slap him to get his attention and somehow my hand got turned around, and I hit him with the back of my hand." Carlson continued: "I knew I should not have hit him. I knew it was wrong, but I was tired and frustrated, and I lost control."

At the close of the prosecution's case, the court returned to the forfeiture question. Still of the view that there was insufficient proof that Carlson had forfeited his Sixth Amendment right to confront Lena and Leif Jr. by his involvement in their failure to appear, the judge considered declaring a mistrial or ordering the trial continued until the witnesses' presence could be secured.

By the following morning, Judge Grossman had changed his mind on the confrontation issue. He told counsel he had reviewed *Giles* overnight and was "prepared, based on [his] reading of *Giles* to make the finding that the defendant has engaged in conduct designed to keep the witnesses from testifying."

Christian and Officer Ward were then each recalled to testify. Christian's testimony repeated what had been elicited at the evidentiary hearing: Lena and Leif Jr. had not been home since Tuesday, and Carlson had not slept at home; Christian believed Lena to have anxiety and bipolar disorder and had had to persuade her to go to court on Tuesday; Lena

"did not want Leif to testify because she thought he would be traumatized by the experience"; and Carlson had told him not to contact his mother because "she was on the verge of having a breakdown." He also testified that it was not unprecedented for Lena to leave home when overly stressed, explaining that "sometimes she will leave for a few days to just get away from it all."

Officer Ward testified to the statements made to him by Lena and Leif Jr. When he arrived on scene, Leif Jr. told him "daddy punched me," and indicated that he had done it with a closed fist. Lena told him Leif Jr. was crying when she got home and told her he was in pain.[3]

Carlson then took the stand in his own defense. His version of events was as follows: The afternoon in question, he was explaining to Leif Jr. how to position his fingers for a chord Leif Jr. was playing incorrectly. Leif Jr. got upset. Carlson said he patiently and calmly pointed Leif Jr. to the printed demonstrations in his music book. Leif Jr.'s agitation escalated, and soon he began to shout in his father's ear, "you are wrong, you are wrong[!]" Carlson said he then tried to "swat" Leif Jr. on the left shoulder with the back of his hand, but missed and hit "what [he] thought was the underside of his chin." He avowed that he "absolutely did not punch" his son, and that he could not have done so, as severed tendons in his right hand prevented him from making a closed fist.

---

[3] Ward also reported that, according to Lena, Leif Jr. said Carlson did not want Lena to know what happened. That comment was admitted only for Officer Ward's state of mind, and was therefore not subject to Confrontation Clause protection. *Williams v. Illinois*, 132 S. Ct. 2221, 2235 (2012).

The jury returned a guilty verdict after two hours of deliberation.   The Superior Court, Appellate Division affirmed, and the Court of Appeal denied a petition for writ of mandate.  The California Supreme Court denied Carlson's habeas petition.  All state rulings on review were summary.

The district court denied Carlson's federal habeas petition and entered judgment for the state.   A certificate of appealability issued on the question whether admission of Lena and Leif Jr.'s statements violated Carlson's Confrontation Clause rights under the Sixth Amendment.

## II. DISCUSSION

### A.  Standard of Review

As Carlson's petition was filed after passage of AEDPA, the constraints of 28 U.S.C. § 2254 apply.  We review the district court's application of AEDPA de novo, *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004), and may grant relief only if the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, or was based upon an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Here, because all the California appellate court decisions in Carlson's case were summary denials, we "look through" to the trial court's reasoning.  *See Cannedy v. Adams*, 706 F.3d 1148, 1157–58 (9th Cir. 2013).   We review the district court's factual findings for clear error.  *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc).

*B.  The Forfeiture by Wrongdoing Doctrine*

The Confrontation Clause of the Sixth Amendment ordinarily  bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).    Statements made in response to the questioning of a law enforcement officer are testimonial if the circumstances establish that "the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see also Michigan v. Bryant*, 131 S. Ct. 1143, 1154 (2011).

Not surprisingly, the state has not disputed that Lena's and Leif Jr.'s contested statements were testimonial.  Without a doubt they were.  Officer Ward questioned Lena and Leif Jr. several hours after Leif Jr. was hit.  Carlson had already been taken into custody and secured in the back of Ward's vehicle.  *See Davis*, 547 U.S. at 822.  Ward's questions reflected a concern for what had "happened" rather than what was "happening."   *Id.* at 830 (internal quotation marks omitted).  So, unless the forfeiture-by-wrongdoing exception applies, admission of those statements against Carlson was prohibited by the Confrontation Clause of the Sixth Amendment. *Crawford*, 541 U.S. at 53–54, 68–69.

The forfeiture-by-wrongdoing doctrine is an exception to the Confrontation Clause's protections.  That doctrine permits the introduction of a testimonial statement by an unavailable witness if the preponderance of the evidence shows that the "witness is absent by [the defendant's] own wrongful procurement." *Reynolds v. United States*, 98 U.S. 145, 158

(1878); *United States v. Johnson*, 767 F.3d 815, 822–23 (9th Cir. 2014) (holding that forfeiture by wrongdoing must be proven by a preponderance of the evidence).

The leading post-*Crawford* case on forfeiture by wrongdoing, *Giles*, explains that the rationale behind the rule is avoidance of "an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them." 554 U.S. at 365. Relying on that rationale, *Giles* rejected a theory of forfeiture by wrongdoing that would have permitted unconfronted testimonial statements to be admitted against a defendant any time the defendant had by his own culpable acts rendered the witness unavailable. *Id.* at 364–65, 368. Explaining that the "bad acts" theory could not be reconciled with "the common law's uniform exclusion of unconfronted inculpatory testimony by murder victims," *id.* at 368, *Giles* held that forfeiture by wrongdoing applies only where the defendant engaged in "conduct *designed* to prevent a witness from testifying," *id.* at 365.

As the parties here agree,[4] *Giles* established the mens rea aspect of the forfeiture-by-wrongdoing exception: The defendant must *intend* that a witness be made unavailable to testify. Neither party's briefing, however, articulates a standard for the kind of action a defendant must take to effectuate that intent.

---

[4] Carlson's argument that the forfeiture-by-wrongdoing doctrine applies only to statements made by the defendant's "victims" has no merit. Supreme Court authority does not so limit the forfeiture exception, and the rule's incentive-avoidance rationale applies as fully to non-victim witnesses as to victims. *See Davis*, 547 U.S. at 833 (explaining that the forfeiture-by-wrongdoing doctrine applies "when defendants seek to undermine the judicial process by procuring or coercing silence from *witnesses* and victims" (emphasis added)).

Despite the parties' reticence, Supreme Court authority is as clear on the overt act point as on the mens rea question. The standard was articulated in the Court's first opinion applying the forfeiture-by-wrongdoing exception, *Reynolds*, 98 U.S. 145, and cited approvingly in *Giles*. *See Giles*, 554 U.S. at 366; *see also Crawford*, 541 U.S. at 62 (citing *Reynolds*).

*Reynolds* explained that, "as long ago as the year 1666," in *Lord Morley's Case*, 6 How. St. Tr. 769, 771 (H.L.1666), adjudicators had admitted statements of an absent witness who "was detained *by the means or procurement of* the [defendant]," and that "now, in the leading text-books, it is laid down that if a witness is *kept away* by the adverse party, his testimony . . . may be given in evidence." *Id.* at 158–59 (emphasis added) (citing evidence textbooks). *Reynolds* concluded that, in that case, the state had proven enough to shift the burden to the defendant to show that he was not "instrumental in concealing or keeping the witness away."**[5]** *Id.* at 160.

Well over a century later, *Davis* and *Giles* reaffirmed that the Confrontation Clause does not protect statements by a witness kept from testifying "by the means or procurement of the [defendant]." *Giles*, 554 U.S. at 359 (internal quotation marks omitted); *see also Davis*, 547 U.S. at 833 (describing

---

**[5]** An 1866 edition of the Dictionary of the English Language defines "instrumental" as "(1) Conducive as means to some end; . . . (2) *Acting* to some end; *contributing* to some purpose; *helpful*." 1 Robert Gordon Latham, A Dictionary of the English Language 1273 (1866) (emphasis added). *See also* 1 B. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 630 (1878) (defining "instrument" as "a means of accomplishing something; a thing useful in the execution of a purpose").

a defendant who "procur[es] or coerc[es] silence from witnesses . . . who obtains the absence of a witness by wrongdoing"). In examining what "means or procurement" signifies, *Giles* cited dictionaries defining "to procure" as, inter alia, "to *contrive* and effect"; "to get . . . as by request, loan, effort, labor or purchase"; "to contrive or devise with care . . . ; to endeavour to cause or bring about." *Giles*, 554 U.S. at 360 (internal quotation marks and alteration omitted).

The pertinent Supreme Court authority, then, clearly establishes that the forfeiture-by-wrongdoing doctrine applies where there has been affirmative action on the part of the defendant that produces the desired result, non-appearance by a prospective witness against him in a criminal case. Simple tolerance of, or failure to foil, a third party's previously expressed decision either to skip town himself rather than testifying or to prevent another witness from appearing does not "cause" or "effect" or "bring about" or "procure" a witness's absence. Such passive behavior is therefore not a sufficient reason to foreclose a defendant's Sixth Amendment confrontation rights at trial.

## C.  *The State Court's Ruling*

Judge Grossman correctly identified *Giles* as the governing standard, and in general terms stated that standard correctly—whether a witness is "kept away" by a defendant who "engaged in conduct designed to keep the witness from testifying." It is not clear from the record precisely what conduct toward that end the court found Carlson to have committed. AEDPA, however, "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). Because the

court could have reasonably inferred on the record before it that Carlson directly participated in securing Lena's and Leif's Jr.'s absence, *see* 28 U.S.C. § 2254(d)(2), and because Supreme Court authority permits application of the forfeiture-by-wrongdoing exception in such circumstances, admission of Lena and Leif Jr.'s statements was not an objectively unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Before proceeding to survey the evidence, we note that on several occasions, Judge Grossman appeared to state a weaker standard, characterizing what Carlson did as "acquiesc[ing]" in the wrongful procurement of Lena and Leif Jr.'s absence, and justifying his ruling by stating his conviction that Carlson was "involved" in or "acquiesced" in Lena and Leif Jr.'s absence, without specifying that Carlson had any responsibility for or meaningfully participated in securing the witnesses' absence.[6]  As we have explained,

---

[6] The only reference *Giles* made to "acquiescence" was in quoting the Federal Rule of Evidence codifying the forfeiture-by-wrongdoing exception to the hearsay rule.  That Rule states that forfeiture by wrongdoing occurs when the defendant has "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." *Giles*, 554 U.S. at 367 (quoting Fed. R. Evid. 804(b)(6) (1997) (internal quotation marks omitted)); *see also Johnson*, 767 F.3d at 822.  *Giles* was, at that juncture, summarizing Rule 804(b)(6), not independently construing it.  Neither *Giles* nor *Davis*, which described Rule 804(b)(6) as "codif[ying] the forfeiture doctrine," ever mentioned "acquiescence" other than in quoting the Rule, and both referred to the kind of act required only in active terms, as we have seen.  *Giles*, 554 U.S. at 367 (quoting *Davis*, 547 U.S. at 833).

Further, "it is beyond doubt that evidentiary rules cannot abrogate constitutional rights."  Thus, to the extent that the Rule does "codify" the forfeiture doctrine, it must be read "to permit the admission of those

simple acquiescence in another's decision not to appear or to cause someone else not to appear is insufficient to trigger the forfeiture-by-wrongdoing exception to the Confrontation Clause.

Judge Grossman, however, also made other statements, using language drawn almost verbatim from *Giles*, indicating that he found that Carlson had engaged in active, culpable conduct, as *Giles* requires. The judge found, for example, that the witnesses were "kept away by means of the defendant or . . . the defendant's procurement defined in *Giles* to contrive and effect." At one point, he noted his conclusion that "the defendant has procured this development on his own." It would not be unreasonable to conclude that Carlson engaged *both* in passive acquiescence and in more active involvement in the witnesses' absence. So the dual articulation of standards cannot demonstrate the application of an erroneous constitutional template. Given that consideration as well as the judge's correct statements of the applicable standard, AEDPA does not allow us to suppose that the trial judge applied a standard contrary to clearly

---

hearsay statements that would be admissible under the *constitutional* doctrine of waiver by misconduct." *United States v. Cherry*, 217 F.3d 811, 816 (10th Cir. 2000) (emphasis added); *see also id.* at 820 (concluding that "the following interpretation of the 'acquiescence' prong of Rule 804(b)(6) is consistent with the Confrontation Clause: . . . [the defendant] *participated directly* in planning or procuring the declarant's unavailability through wrongdoing"). Indeed, the 2011 stylistic amendments to Rule 804(b)(6) make more clear that Rule applies where the defendant is responsible for the result—where he "wrongfully *caused*—or acquiesced in wrongfully *causing*—the declarant's unavailability as a witness, and *did so intending that result*." Fed. R. Evid. 804(b)(6) (2011) (emphasis added).

established Supreme Court law.  *See* 28 U.S.C. § 2254(d)(1); *Visciotti*, 537 U.S. at 24.

Turning to the record before us, we cannot say that, under 28 U.S.C. § 2254(d)(2), the trial court's finding that Carlson himself actively procured the witnesses' failure to appear was "objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The evidence is, to be sure, essentially circumstantial.  But the applicable trial court burden of proof in this instance was preponderance of the evidence, not proof beyond a reasonable doubt.  *See People v. Zambrano*, 41 Cal. 4th 1082, 1147 n.21 (2007), *disapproved of on other grounds by People v. Doolin*, 45 Cal. 4th 390 (2009); *see also Johnson*, 767 F.3d at 822–23.

The evidence upon which the judge could have relied was as follows:

(1) Lena was distraught and may have had mental health issues.  That evidence could support an inference that she would require emotional care and practical help.

(2) Carlson was away from his own home on the nights during the trial when his wife and son were not there.  That evidence suggests that he knew where they were and was with them while they were absent.

(3) According to Christian, Carlson had instructed him and the other children not to call their mother.  Also, Christian had been the family member who encouraged Lena's

> attendance on the first day of trial. That
> evidence could support both (i) an inference
> that Carlson wanted to keep his wife and son's
> whereabouts secret so they would not be
> found and compelled to appear, and (ii) an
> inference that he wished to keep his wife
> away from any influence that might persuade
> her to reappear, with their son or without him.

In *Reynolds*, the Supreme Court concluded that the forfeiture-by-wrongdoing doctrine applied to a similar set of facts. 98 U.S. at 160. There, the defendant had told an officer looking for a witness that the witness was not home, when the facts suggested that she was, and informed the officer that the witness would "not appear in this case." *Id.* (internal quotation mark omitted). The facts in *Reynolds* in some respects more strongly supported the inference of wrongful procurement—there, the defendant directly rebuffed law enforcement's efforts to locate a witness, *id.*, whereas here, Carlson suggested his knowledge of his wife's whereabouts to his own family, not to the police. Also, Christian testified that Lena had her own aversions to testifying, and to allowing Leif Jr. to testify, while in *Reynolds* we learned nothing about the witness's own motivation to avoid testifying, one way or the other. But the reason a defendant procures a witness's absence is not pertinent to the forfeiture-by-wrongdoing doctrine, once the court has rejected the witness's protests and insisted that the witness appear.[7]

---

[7] We recognize that requiring a young child to testify against his own father could well be traumatizing to the child. We note that the dilemma presented by this case perhaps could have been minimized by cooperation among the parties and the court. The fear of trauma to Leif Jr. might have

Also, in some other respects, the facts supporting a finding of wrongful procurement here are at least as strong as those in *Reynolds*. Carlson himself was not at home on the nights his wife and son were away, and he affirmatively sought to keep other family members from communicating with his wife or knowing where she was. Like the facts in *Reynolds*, those circumstances demonstrate both concealment of the witnesses' whereabouts and insulation of the witnesses from the reach of either compulsion or persuasion regarding showing up at trial. They also indicate that Carlson had some involvement in assuring their wellbeing while they were evading process. Overall, then, the facts in this case are approximately as strong in suggesting active involvement in the witnesses' nonappearance as those in *Reynolds*—or, at least, a reasonable jurist could so conclude.

Under AEDPA's "highly deferential" standard, *Visciotti*, 537 U.S. at 24 (internal quotation mark omitted), we cannot say that it was objectively unreasonable for the court to make an inference with regard to Carlson's conduct here similar to the one *Reynolds* sanctions. We therefore deny relief. *See* 28 U.S.C. § 2254(d)(2).

## III. CONCLUSION

The judgment of the district court is **AFFIRMED**.

---

been lessened, for example, had he been allowed to testify from a comfortable location remotely, via one-way, closed-circuit TV. *See People v. Lujan*, 211 Cal. App. 4th 1499, 1506 (2012), *as modified on denial of reh'g* (Jan. 15, 2013); *see also United States v. Garcia*, 7 F.3d 885, 888 (9th Cir. 1993) (holding that the Child Victims' and Child Witnesses' Rights statute, 18 U.S.C. § 3509, allowing victims of child abuse to testify via closed circuit television, does not violate a defendant's Confrontation Clause rights).