Filed 8/9/16  P. v. Winkler CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067975 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD257780) |
| PAUL LIONELL WINKLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Megan J. Beale and Kelly Ann Johnson, Deputy Attorneys General, for the Plaintiff and Respondent.

A jury convicted Paul Lionell Winkler of assault by means likely to cause great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 1), corporal injury to a cohabitant resulting in a traumatic condition (§ 273.5, subd. (a); count 3), false imprisonment by violence, menace, fraud or deceit (§§ 236, 237, subd. (a); count 4 ), and misdemeanor child endangerment (§ 273a, subd. (b); counts 5, 6, and 7). It found Winkler guilty of misdemeanor assault (§ 240) as a lesser included offense to assault with a deadly weapon alleged in count 2. The trial court found true allegations that Winkler had suffered one strike prior conviction (§§ 667, subds. (b)-(i), 1170.12, 668) and had served four prior prison terms (§ 667.5, subd. (b)). On the People's motion it struck an alleged serious felony prior conviction (§ 667, subd. (a)(1)). The court sentenced Winkler to an aggregate term of nine years in state prison, consisting of a doubled midterm of six years on count 3, a doubled midterm of six years on count 1 stayed under section 654, a concurrent doubled midterm of four years on count 4, 180 days each on counts 2, 5, 6 and 7 (with counts 2 and 7 to be served concurrently and counts 5 and 6 to be consecutive to count 3), and consecutive one-year terms for each of three prior prison convictions. The court struck the fourth prior prison conviction. It ordered the nine-year prison term to be served consecutively to one year in local custody.

On appeal, Winkler contends the trial court erred and denied him his state and federal constitutional rights to cross-examination and confrontation by admitting into evidence the prior testimony of Winkler's cohabitant, A.A., and two of her children after

[1]    Statutory references are to the Penal Code unless otherwise stated.

the prosecutor failed to exercise due diligence in attempting to secure their presence at trial. He further contends the evidence was insufficient to support his count 7 conviction for endangerment as to another child of A.A. Finally, Winkler contends imposition of a concurrent term on the count 4 conviction violated section 654's proscription against dual punishment for a single act or course of conduct. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The factual background is taken in part from the November 2014 preliminary hearing testimony of A.A., R.A. and T.A., which was read into the record at trial after the trial court found them to be unavailable.

A.A. had a ten-month dating relationship with Winkler, during which Winkler became abusive toward her and her children from another relationship, sons T.A. and R.A., and daughter B.A.[2] A.A. also had a daughter with Winkler, P.A., who was born in July 2014. For a time, they all lived together in a one-room apartment at a transitional homeless shelter.

After P.A. was born, Winkler began threatening and hitting A.A. On August 5, 2014, while the family was out in public, Winkler accused A.A. of making sexual gestures to others by merely eating a piece of pizza, and told her she had "fuck[ed] up the day" by scratching her nose. A.A., Winkler and the two girls then returned to their apartment while the boys went to the library. Winkler told A.A. to enter the bathroom,

---

2    We use the initial T. for A.A.'s younger son's nickname, as his given name starts with the same letter as his mother's. At the time of the preliminary hearing, T.A. was nine years old, R.A. was eleven years old, and B.A. was four years old.

3

turned on music to block any noise, instructed her to get on her knees, pushed her down, tied her hands and mouth with clothing, and hit her repeatedly with his belt while he held her down and she begged him to stop. A.A.'s head struck the toilet while Winkler hit her. Winkler only stopped when A.A. told him she would sign a contract. Winkler untied A.A. and A.A. got up off the floor. A.A. told Winkler what to write and they both signed the contract, in which A.A. agreed not to do anything behind his back or make sexual gestures to any children or adults. After they signed the contract, they sat down "for a little bit," but Winkler kept asking A.A. how she had learned to make her gestures, and when she said she did not know, he began hitting her again with an electrical cord until A.A. lied and told him she had learned them from an old lady. At the time, B.A. was in bed sleeping and P.A. was on the bed. Winkler asked A.A. if she was teaching her gestures to her children, and when she responded yes, he told her when they returned they were "going to get their ass whooped."

A.A. was sitting on the bed with P.A. when T.A. and R.A. returned home. She remained quiet at Winkler's demand. Winkler told the boys to strip down to their boxer shorts, and that he would hit them—give them the "whooping of [their] life"—if they lied to him. He asked R.A. if he ever had sex with A.A. and other detailed and graphic questions about what they had done sexually. He then asked the same questions of T.A. When the boys responded in the negative, he raised up his belt. Winkler hit T.A. in the leg. Winkler continued asking the questions until the boys began to lie and say yes. B.A. was awake on the bed and close enough to hear the incident. Winkler thanked the boys and told A.A. to return to the bathroom, where he accused her of having sex with her

4

sons, slapped her, and choked her with the belt until she passed out. When A.A. awoke, Winkler told her to fix her hair and cover the knot on her temple.

A.A. was eventually able to run to the manager's office at the shelter. A.A. was scared and upset, and the manager, George Ossavou, felt she needed to confide in someone and needed help. A.A. told Ossavou that she had been the victim of domestic violence, it had been going on for a long time, and she wanted Winkler to leave. A.A. explained she had been choked and that Winkler forced her to say she was having sex with her children, and she showed Ossavou a bump on her forehead and a bruise on her arm. She did not want Ossavou to call police because she felt there would be repercussions. Ossavou saw that R.A. was sad and upset, and that T.A. and B.A. were crying. Ossavou spoke with all three children at the same time; R.A. told Ossavou that Winkler was "beating us up, he's threatening us, he's asking us to say that we're having sex with our mom." Ossavou could not recall what T.A. told him.

Ossavou spoke to Winkler and told him to leave the program, to which Winkler responded by accusing A.A. of molesting her children. Ossavou eventually called police. Winkler left with P.A.

San Diego Police Officer Jamie Huntley responded to Ossavou's call, and when she contacted A.A., saw a bump on A.A.'s head. A.A. was afraid and upset, and seemed "cloudy" from being hit in the head. A.A. complained of pain to her back and arm, and the officer saw two small scratch marks on A.A.'s upper/mid back. A.A. recounted to Officer Huntley what had happened that day, including when Winkler told her to enter the bathroom, knocked her to the ground, tied up her hands and mouth, and struck her

5

with his belt. A.A. reported that Winkler grabbed the hair on the back of her head and slammed her head against the toilet. A.A. reported that Winkler strangled her with the belt and that she lost consciousness for a short period of time. Officer Huntley spoke with all three children. B.A. was just playful and wanted to look at the items in the officer's belt. T.A. and R.A. both appeared timid and afraid to discuss the matter, but both described in some detail Winkler's demand that they strip to their shorts and his questions and threats. T.A. also told the officer he could hear his mother from the bathroom asking Winkler why he was choking her and tying her hands, and he heard choking sounds from the door. According to T.A., Winkler told him, "I would have already killed this girl if she wasn't your mother." R.A. similarly reported that Winkler had told him, "The only reason why I haven't killed this bitch yet is because she's your mother." R.A. stated Winkler had hit him with Winkler's belt six or seven times before.

A.A. went to the hospital and spoke with detectives. An emergency room physician observed she had a swollen bruise on her forehead.

A police officer arrested Winkler the next day, and Winkler asked the officer to look at the contract that A.A. had signed the previous day promising not to "do any sexual gestures or signing to any kids or adults" behind Winkler's back or lie about it.

DISCUSSION

I. *Admission of Preliminary Hearing Testimony*

A. *Background*

The trial court conducted jury selection and heard pretrial motions on March 11 and 12, 2015. On Monday, March 16, 2015, the prosecutor notified the court that she had

6

been informed early that morning that A.A. and her children were not at home. She related that A.A. had been personally served with a subpoena, district attorney investigator Todd Brehart had spoken with A.A. the previous Friday, they were ready to be present and Brehart was scheduled to pick them up that morning. She asked the court to issue a bench warrant and trail the trial until the next day. Winkler's counsel objected and asked that the case be dismissed. The court trailed the matter until the next morning.

The next morning, the prosecutor confirmed that A.A. was not present in San Diego. She explained that after learning of A.A.'s absence, her office had pulled Winkler's jail calls, which showed approximately 22 calls to A.A. including on a different inmate's phone time, and during them A.A. had stated she was in Nebraska where her family lived. The prosecutor could not independently confirm that fact with the airlines. She reiterated that the People had subpoenaed A.A. and her children, but A.A. had chosen to ignore the subpoena and it was apparent from the calls that A.A. already knew she was not going to come to court; that she had "worked out this plan with [Winkler]." The prosecutor moved the court to find A.A. unavailable. Defense counsel again objected, pointing out that A.A. had stated in phone calls with Winkler that after the preliminary hearing she told the district attorney that she was not going to testify again and was not coming back.[3] He argued the district attorney was on notice A.A. was planning to leave, but did not take necessary steps to secure her presence.

---

3    At trial, the tape-recorded jail calls between Winkler and A.A. were played for the jury.

7

The court heard testimony from investigator Brehart, who was assigned to contact A.A. and her children, and district attorney investigator Robert Guadarama. Brehart testified that he and the prosecutor had met with A.A. before the preliminary hearing and served her with a subpoena, and she and her children appeared and testified at that hearing. Thereafter, investigator Guadarama subpoenaed A.A.[4] and Brehart met with A.A. in person on Thursday of the prior week, explaining to her that they were going to trial on Monday and he would personally pick her and the children up and drive them to court. Brehart testified that at the time, A.A. seemed "on board" with that plan, and at no point told him she did not want to testify and would be leaving town. He stated that A.A. gave him no indication she would fail to appear. When Brehart arrived at A.A.'s apartment on Monday, it was vacant. He spoke with some of the residents as well as the property manager, and was told no one had seen A.A. since the previous Friday. On cross-examination, Brehart admitted he had some difficulty contacting A.A. on her phone before he met with her the previous week, and that he had access to jail calls but did not conduct an investigation into any jail calls leading up to trial. Brehart testified that he

---

4    Investigator Guadarama later testified that he went to A.A.'s apartment on March 6, 2015, and when he knocked on the door A.A. answered right away. He identified himself and the fact he was serving her subpoenas, and he served A.A. with subpoenas for her and her children. Investigator Guadarama testified that at no point did A.A. indicate she was not interested in showing up for trial or she was going to be leaving the state. His only conversation with her was to tell her he was serving the subpoenas and she should call the office to coordinate, and he gave her contact numbers in case anything changed. After hearing this testimony, the trial court found that the foundation had been laid for admission of the preliminary hearing testimony.

8

was not aware that A.A. was in contact with Winkler via jail calls or putting money on his prison books, even though he had access to that information.

Defense counsel argued that due diligence required the prosecution to listen to A.A.'s jail calls with Winkler and had that been done, the prosecution would have known A.A. planned to leave the state. The prosecutor pointed out that every indication was that A.A. was on board; that she had been subpoenaed and had an in-person meeting with investigator Brehart who confirmed he would pick her up for trial. She argued her office had no idea A.A. was not planning to come or that she was talking to Winkler on jail calls, and had A.A. been uncooperative, they would have reviewed the jail calls, but every conversation with A.A. was to the contrary.

The court found A.A., T.A. and R.A. were subpoenaed and unavailable as witnesses, and ruled the People could admit their sworn testimony from the preliminary hearing.

B. *Legal Principles*

The confrontation clauses of both the federal and California Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) This right, however, is not absolute. (*People v. Sanchez* (2016) 63 Cal.4th 411, 440; *People v. Cromer* (2001) 24 Cal.4th 889, 897 (*Cromer*).) "If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial. In a criminal case, the prosecution bears the burden of showing that the witness is unavailable

9

and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*Sanchez*, at p. 440.)

Evidence Code section 1291, subdivision (a), provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] . . . The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." A witness is considered "unavailable" if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) " '[T]he term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." ' " (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 440; *People v. Cromer*, s*upra*, 24 Cal.4th at p. 904.) Relevant considerations include whether the search was timely begun, the importance of the witness's testimony, and whether leads were competently explored. (*Cromer*, at p. 904.) In this regard, California and federal constitutional requirements are the same. (*People v. Herrera* (2010) 49 Cal.4th 613, 622.)

In assessing the prosecution's reasonable diligence in locating a missing witness so as to use that witness's preliminary hearing testimony, we conduct a "twofold inquiry." (*People v. Cromer*, *supra*, 24 Cal.4th at p. 900.) We first determine the historical facts: "a detailed account of the prosecution's failed efforts to locate the absent witness." (*Ibid.*)

10

If those facts are in dispute, we deferentially review the trial court's factual findings. (*Ibid.*) Second, we determine whether these historical facts amount to due diligence by the prosecution, which requires application of an objective, constitutionally-based legal test to the historical facts. (*Ibid.*; see *People v. Sanchez*, *supra*, 63 Cal.4th at p. 440 ["The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially"].)

Where a witness is " 'detained' or 'kept away' by the 'means or procurement' of the defendant" (*Giles v. California* (2008) 554 U.S. 353, 359) with the defendant's intent to cause the witness's unavailability, a common law exception to the bar of the confrontation clause is applicable. (*Giles*, at pp. 359-361; see also *Davis v. Washington* (2006) 547 U.S. 813, 833 ["one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation"].) Under this exception, commonly known as "forfeiture by wrongdoing," the defendant must affirmatively "engage[] in conduct *designed* to prevent the witness from testifying." (*Giles*, at pp. 360, 365; see *Carlson v. Attorney General of California* (9th Cir. 2015) 791 F.3d 1003, 1010.) "Simple tolerance of, or failure to foil, a third party's previously expressed decision either to skip town himself rather than testifying or to prevent another witness from appearing does not 'cause' or 'effect' or 'bring about' or 'procure' a witness's absence. Such passive behavior is therefore not a sufficient reason to foreclose a defendant's Sixth Amendment confrontation rights at trial." (*Carlson*, at p. 1010.) The doctrine is not limited to situations where the defendant murders the witness (see *People v. Jones* (2012) 207

11

Cal.App.4th 1392, 1399); it applies to acts intended to prevent a witness from testifying and to acts intended to dissuade a witness from cooperating with law enforcement authorities. (*People v. Banos* (2009) 178 Cal.App.4th 483, 501.) The rule is necessary to avoid "an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them." (*Giles*, at p. 365; *Carlson*, at p. 1009.)

C. *Contentions*

Winkler contends the prosecution failed to meet its burden to establish it exercised due diligence in its attempts to procure A.A., T.A. and R.A. for trial. He maintains the prosecutor was aware that individuals who allege domestic violence often are not cooperative in pursuing criminal charges against the abuser, and she had reason to believe A.A. did not want to be involved in prosecuting him, as A.A. specifically told Ossavou she wanted Winkler removed but did not want Ossavou to call the police. Winkler points out that during jail calls, A.A. stated she had informed the prosecutor that she was not coming back after the preliminary hearing, and he argues the prosecutor made no attempt to maintain contact with A.A. in the four months between the November 2014 preliminary hearing and the trial, which was initially set for January 2015, and then eventually March 11, 2015. He argues that the "prosecution in this matter failed to establish that A.A. and her sons were unavailable because it did nothing more than attempt to confirm A.A.'s presence in Nebraska before seeking to introduce the transcripts of the preliminary hearing testimony" and it failed to make any attempt to compel their attendance through the cooperation of Nebraska courts.

12

The People respond that Winkler forfeited his confrontation clause challenge because he was responsible for A.A.'s unavailability as evidenced by his jail calls in which he told her not to show up at trial, and that the prosecutor would "just dismiss this shit" if she did not attend. They further maintain that the prosecutor exercised reasonable diligence in attempting to procure A.A. and her children's attendance at trial; that the evidence showed she did not know A.A. planned to be absent and as a result did not need to take steps to prevent her from leaving. The People argue that the prosecutor's obligation to seek assistance from the Nebraska courts did not arise because the prosecution did not know if A.A. was in Nebraska. Finally, the People argue that error, if any, in admitting the testimony was harmless beyond a reasonable doubt given the testimony from Ossavou and others who related what A.A. had told them about the incident and established the elements of Winkler's offenses.

D. *Analysis*

We need not decide whether the prosecutor exercised reasonable or due diligence in locating A.A. or attempting to obtain her and her children's presence at trial, because we agree with the People that Winkler forfeited his constitutional right to confrontation by causing A.A.'s absence.[5]

---

5    As we have summarized above, during the hearing on A.A.'s unavailability, the People discussed Winkler and A.A.'s jail calls, describing how they showed the two had "worked out [a] plan" for A.A. to absent herself. The People never specifically argued below, however, that forfeiture by wrongdoing prevented Winkler from challenging admission of A.A. and her children's preliminary hearing testimony, and the trial court did not rule on the doctrine. The People argue forfeiture by wrongdoing in their respondent's brief, and in reply Winkler addresses the issue on the merits, without

13

The first jail call admitted into evidence from Winkler to A.A. took place on March 2, 2015, nine days before trial was to start.  Winkler, who was using another inmate's telephone time, told A.A. he had had a professional visit, that the district attorney was probably expecting to get in contact with A.A., and he asked A.A. if she had heard from her.  A.A. told him she had not, and the following exchange took place:

"Winkler:  Oh okay, cool.  Well yeah, the—the main thing is if you can babe, you know, this is what, this—this is what is needed, that you don't show up at all.  That way she can't . . .

"[A.A.]:  Uh huh.

"Winkler:  . . . she can't push no script.  You know what I'm saying, the D.A.

"[A.A.]:  I know.

[¶] . . . [¶]

"Winkler:  Oh okay.  Well this is the reason why I got the uh . . . , the other time, because that way, you know, we can talk freely without it having being a my [*sic*] recorded call . . . ."

[¶] . . . [¶]

"Winkler:  . . . Yeah so hopefully, you know what I'm saying, well, when, if that happens, you know what I'm saying they'll just dismiss this shit.  You know?

"[A.A.]:  Okay.

---

challenging the People's ability to raise it for the first time on appeal.  In any event, because the underlying circumstances and content of the jail calls are not in dispute, the question is one of law that may be raised for the first time on appeal.  (See, e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1061; *Hale v. Morgan* (1978) 22 Cal.3d 388, 394; *UFITEC, S.A. v. Carter* (1977) 20 Cal.3d 238, 249, fn. 2.)

14

"Winkler: And then I, well I can come on home and shit and be with my loved ones, you know.

"[A.A.] Well I told you, you know the first time, when I did it, I thought it was going to be easy, but it was not, so . . .

"Winkler: Right.

"[A.A.] I don't think I'm going to be doing that shit again.

"Winkler: Yeah, I hope not, because I mean, shit, if, if, if you did I mean it's like, everything that I'm talking about happening as far us having family [*sic*] . . . another baby, uh, me trying to raise [P.A.] with you and all that shit goes out the window . . .

"[A.A.]: That's crazy though.

"Winkler: But there is nothing they can do if you don't show up, but that's the thing.

"[A.A.]: Well if I would've known the second time . . .

"Winkler: Right.

"[A.A.]: . . . I mean, I already told 'em like, I can, you know, I was like, I told them like, I don't think I'm gonna be doing this again.

"Winkler: And what . . .

"[A.A.]: So . . .

"Winkler: . . . she say?

"[A.A.]: She just looked at me, she was like, well we might be looking for you again, I was like, well good luck, that's what I told her."

"Winkler: Oh she said . . .

15

"[A.A.]:  They probably will.

"Winkler:  . . . she was going to be looking for you again?

"[A.A.]:  That's what she like, we might need you to come back again.  I'm like, that's it, I'm not coming back.

"Winkler:  Yeah, nah, yeah don't work with them baby we, we got plans, I mean, and, and if you work with them, then that means we have to go against me and then well, whatever we planning . . . , it's not going to work, 'cause I'm not going to be able to be there.

"[A.A.]:  I know."

The second call admitted into evidence took place on March 11, 2015, the day set for trial.  During that call, Winkler asked A.A. if she had gone "over there" and A.A. replied that she had not, and that she was going to Nebraska anyway with the children and then would come back with P.A., since she had missed the court date and someone might be looking for her.  Winkler responded:  "Oh okay.  Well, . . . spend a couple days up there, wait you know, wait till this shit is over with, till you hear from me.  Right?" A.A. stated, "Okay."

We conclude the jail calls constitute substantial evidence that Winkler intended to convince A.A. to ignore the prosecution's efforts to secure her attendance and to procure her absence by asking her to evade the district attorney and not show up for trial.  When A.A. told Winkler later that she was going to Nebraska but returning, he implored her to stay out of California until he contacted her.  In her telephone conversations with Winkler, A.A. expressed a desire to cooperate with him and not testify in court.  The

16

United States Supreme Court stated in *Giles v. California*: " 'The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he kept away . . . . [The Constitution] grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege.' " (*Giles v. California*, *supra*, 554 U.S. at p. 372.)

II. *Sufficiency of Evidence of Misdemeanor Child Endangerment* (*Count 7*)

Winkler contends his conviction on count 7, the misdemeanor child endangerment charge as to B.A., must be reversed because the evidence was insufficient to prove his acts were directed at B.A., witnessed by her, or caused her unjustified mental suffering. More specifically, Winkler maintains that there was no evidence that B.A., who was then three years old, was listening to the incident involving his questioning T.A. and R.A. about engaging in sex or specific sexual activity with their mother, and the evidence showed B.A. was sleeping at the time he was hitting A.A. in the bathroom. He argues B.A.'s presence in the room, without more evidence, is insufficient to prove his conduct inflicted mental suffering upon her.

"Where, as here, a defendant challenges the sufficiency of the evidence on appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] A reviewing court must reverse a

17

conviction where the record provides no discernible support for the verdict even when viewed in the light most favorable to the judgment below.  [Citation.]  Nonetheless, it is the jury, not the reviewing court, that must weigh the evidence, resolve conflicting inferences, and determine whether the prosecution established guilt beyond a reasonable doubt.  [Citation.]  And if the circumstances reasonably justify the trier of fact's findings, the reviewing court's view that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment."  (*People v. Hubbard* (2016) 63 Cal.4th 378, 392.)  The substantial evidence review standard is the same in cases in which the People rely primarily on circumstantial evidence.  (*People v. Salazar* (2016) 63 Cal.4th 214, 242.)

Section 273a defines misdemeanor child abuse.  A person is guilty of the crime if that person, among other things, " 'willfully causes or permits any child to suffer, or inflicts thereon unjustifiable . . . mental suffering' 'under circumstances or conditions other than those likely to produce great bodily harm or death.' "  (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1434, citing § 273a, subd. (b); see also *People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980.)  The statute "encompasses a wide variety of situations and includes both direct and indirect conduct."  (*People v. Burton* (2006) 143 Cal.App.4th 447, 454.)  When a charge of child abuse is based on the mental suffering resulting from a child being exposed to physical abuse by one parent against the other, the theory at issue is indirect child abuse.  (*Hamlin*, at p. 1441, citing *Burton*, at pp. 450-451, 454-455.)

18

In *Burton*, the court concluded the defendant's section 273a, subdivision (b) conviction was supported both legally and factually where the defendant's eight-year-old son observed the immediate and "horrible, bloody aftermath" (*People v. Burton*, *supra*, 143 Cal.App.4th at p. 455) of his father's acts in slashing several deep cuts in his mother's face. (*Id*. at p. 451.) The court rejected the defendant's argument that because the attack was not directed at his son and did not occur in his presence, the section did not apply. (*Id*. at pp. 453-455.) The record contained not only evidence that the defendant knew of the boy's presence, but that following the attack, the boy screamed about having to leave and tried to put the car in reverse, later wished himself dead in journal entries, and got in trouble at school. (*Id*. at p. 455.) The court concluded that "[a] reasonable person would easily recognize that a child would endure unjustifiable metal suffering by being on the scene . . . ." (*Ibid*.)[6]

The evidence as to B.A. is certainly not as severe as that in *Burton*. However, unlike *Burton*, it involves evidence from which the jury could conclude B.A. directly witnessed Winkler's abusive acts toward her brothers R.A. and T.A., and at least heard Winkler choke her mother. The evidence showed that B.A. was in close proximity on a bed within a single room apartment at the time, and A.A. testified B.A. was awake and

---

6     In *Hamlin*, the court held the defendant's right to parent and right of free expression was not infringed by his conviction of misdemeanor child abuse based on "willfully inflict[ing] unjustifiable mental suffering" where the evidence established he falsely told his children (who were of unspecified age) their grandfather was a child molester and leader of satanic cult who intended to abduct or kill them, and that the grandfather and children's mother had molested them in the past. (*People v. Hamlin*, *supra*, 170 Cal.App.4th at pp. 1421, 1442-1444.)

"close enough to hear" when Winkler was threatening the boys. The evidence permitted the jury to conclude that B.A. watched and at least listened while Winkler ordered her brothers to strip down to their boxer shorts, told them they would get the "whooping of [their] life" if they lied, questioned them in offensive language as he had his belt raised and at the ready, and hit T.A. in the leg. After Winkler addressed the boys, he turned his attention back to A.A. and told her to return to the bathroom, where he accused her of having sex with her sons, slapped her, and choked her with the belt until she passed out. This court must presume the existence of every fact the jury could reasonably deduce from the evidence (*People v. Huynh* (2012) 212 Cal.App.4th 285, 304), and here, the jury could reasonably infer that, like T.A., B.A. also heard her mother's pleas and choking sounds coming from the bathroom. Thus, B.A. was present "at the scene" when Winkler's abuses of R.A. and T.A., and his attack on A.A., occurred, and as it was a single room apartment, the jury could readily conclude Winkler knew she was present. (*People v. Burton*, *supra*, 143 Cal.App.4th at p. 455.) Ossavou testified that when A.A. and the children came to his office, T.A. and B.A. were crying. As the *Burton* court observed, children "often witness domestic violence" and such children "suffer adverse effects similar to victims of direct physical and sexual abuse." (*Burton*, at p. 456.) There is no evidence to suggest that because B.A. was three years old she did not appreciate what was being said or that violent acts were occurring, and we conclude the jury could reasonably infer from her reaction in the manager's office that she did so. Winkler does not contest that his acts against A.A. and her sons were willful. The existence of other evidence that might allow a different conclusion does not affect our substantial evidence

20

review.  We conclude the evidence was sufficient to support the jury's finding that Winkler willfully permitted B.A. to suffer unjustifiable mental suffering.

### III.  *Imposition of Concurrent Term on Count 4*

Winkler contends the court's imposition of a concurrent prison term on count 4—false imprisonment by violence or menace—violated section 654's proscription against dual punishment for a single act or course of conduct.  He maintains that his count 1 (assault by means of force likely to produce great bodily injury), count 3 (injury to cohabitant resulting in traumatic injury) and count 4 offenses "resulted from a single indivisible course of conduct with a single objective," that the acts underlying them occurred within a very short period of time, and the acts were part of a continuous course of conduct in that according to A.A., he was upset at her for making sexual signs and looking at another man on the street, directed her into the bathroom, and bound and hit her all to "confront and punish A.A. for her transgressions."  According to Winkler, there is no substantial evidence to support the court's factual determination that the offenses involved more than one objective, and the sentence on count 4 must be reversed and stayed.

Pointing out the trial court stayed Winkler's six-year sentence on count 1, the People respond that substantial evidence supports the court's implied finding that Winkler had multiple independent objectives in falsely imprisoning A.A. and inflicting corporal injury on her.  Specifically, they argue that when Winkler first followed A.A. into the bathroom, told her to get on her knees and tied her hands and mouth, his objective was to have greater ease in exercising control over her.  They argue the court could infer that

21

Winkler committed these acts to prevent A.A. from escaping, to prevent the children from observing what he was going to do to their mother, and to humiliate her and make her feel helpless, and when he subsequently hit A.A., his objective was to punish her for her conduct. Finally, the People argue that Winkler's false imprisonment of A.A. was not merely incidental to the infliction of corporal injury, or vice versa, as Winkler could have inflicted corporal injury on A.A. whether or not she was imprisoned.

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "generally precludes multiple punishments for *a single physical act* that violates different provisions of law [citation] as well as multiple punishments for an *indivisible course of conduct* that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111-112.) " ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 885; see also *People v. Correa* (2012) 54 Cal.4th 331, 341.) It is not the temporal proximity of the offenses that determines whether the transaction is indivisible. (*People v. Capistrano*, at p. 886.) " ' "The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the] finding the defendant formed a separate intent and

22

objective for each offense for which he was sentenced." ' " (*Ibid.*) Accordingly, we review the court's express or implied determination that two crimes were separate, involving separate objectives, for substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

The trial court implicitly concluded that section 654 authorized separate punishment for the count 3 and count 4 offenses; it did not explain how Winkler had independent objectives in inflicting the corporal injuries on A.A. and imprisoning A.A. with violence or menace. However, the probation report did discuss and explain the probation officer's section 654 conclusions: "Count 1 relates to the first instance in which the defendant assaulted the victim in the bathroom by striking her with his belt. Count 4 relates to the second beating in the bathroom, during which the defendant [*sic*] attempted to get away but was forcibly detained in the bathroom. Count 3 appears to relate to the third time the defendant inflicted willful corporal injury of his girlfriend in the bathroom. [¶] The first two crimes are separated by a period of time when the defendant and the victim were outside of the bathroom discussing a contract and arguing about the defendant's accusation that the victim had sex with her sons. The second and third crimes are separated by another period of time when both Mr. Winkler and [A.A.] were in the living room, and Mr. Winkler was interrogating the children. In addition, it appears the first beating was meant as punishment for the victim's alleged sexual signaling to men in the park, the second as retribution for the victim's failure to sign the contract, and the

23

third in reaction to the children's forced admission to having sex with their mother. As the three crimes are separated by both time and intent, [section] 654 does not apply."[7]

We conclude substantial evidence supports the court's decision not to stay Winkler's sentence on count 4, which was based on Winkler forcing A.A. into the bathroom the second time and choking her. The evidence does not establish a single indivisible course of conduct with a single objective. Rather, it shows Winkler forced A.A. into the bathroom first after they returned home to beat her with his belt, and then forced her back into the bathroom again after he interrogated her sons, the second time choking her with his belt. The incidents were separated by a break in time, during which A.A. was sitting quietly on the bed with P.A., and the trial court could readily conclude Winkler harbored independent intents and objectives in first forcing A.A. into the bathroom to punish her for her supposed signaling to men, and then later to punish her for purportedly engaging in sex with her children. Though Winkler suggests the prosecutor impliedly conceded an indivisible course of conduct in her closing arguments to the jury,[8] it was the court's obligation at sentencing to consider section 654, and we look to the trial evidence as well as the probation officer's analysis, to decide whether substantial evidence supports the court's implicit finding.

---

[7] Additionally, in discussing the issue of consecutive versus concurrent terms, the probation report states: "As explained above, the crimes in Counts 1, 3, and 4 had different objectives and were predominantly independent of each other. They involved separate acts of violence and the defendant had ample time after each assault to reconsider his course of action, so they cannot be considered a single period of aberrant behavior. Thus, consecutive sentencing is justified. However, the overall prison exposure available with concurrent sentencing appears appropriate, and concurrent sentencing will be recommended."

24

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.

---

8    In part, during closing arguments the prosecutor described count 3 as based on Winkler inflicting injuries to A.A.'s head and back, though she stated it "technically encompass[ed] the entire course of conduct that happened on August 5th by the defendant." She described count 4 as ordering A.A. into the bathroom and tying her with the "additional act of violence" of taking "out the belt and then . . . smash[ing] [A.A.'s] head into that porcelain toilet . . . [causing] visible injuries."